(Nos. 19264, 19265.—

THE TRIBUNE COMPANY, Appellee, *vs.* WILLIAM HALE THOMPSON *et al.* Appellants.

*Opinion filed October 25, 1930—Rehearing denied Dec. 15, 1930.*

SCHUYLER, WEINFELD & PARKER, (WILLIAM C. GRAVES, CARL J. APPELL, and GEORGE W. LENNON, of counsel,) for appellants.

KIRKLAND, FLEMING, GREEN & MARTIN, (WEYMOUTH KIRKLAND, HOWARD ELLIS, WILLIAM WILSON, and J. B. MARTINEAU, JR., of counsel,) for appellee.

Mr. JUSTICE ORR delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county finding the appellants, William Hale Thompson, George F. Harding, and other defendants, guilty of conspiracy and holding them jointly and severally liable to pay to the city of Chicago the total sum of $2,245,604.52, principal and interest, and pay the costs of suit.

An original bill of complaint in chancery in this cause was filed June 24, 1921, by the Tribune Company, a corporation, as a tax-payer of the city of Chicago, against William Hale Thompson, George F. Harding, Ernest H. Lyons, Edward C. Waller, Jr., Arthur S. Merigold, Michael J. Faherty and the city of Chicago. An amended bill of complaint was filed March 30, 1925, naming Charles M. Nichols, Arnold H. Brautigam, Frank J. Koch and Percival B. Coffin as co-defendants. A second amended and supplemental bill of complaint was filed February 17, 1927, at the time complainant rested its case, for the purpose, as stated by counsel, of making the allegations of the bill conform to the proof. In substance, so far as the cause of action against appellants is concerned, there is no material difference between the original and amended bills of complaint. We shall therefore consider the allegations of the second amended and supplemental bill and in this opinion refer to it as the bill of complaint.

It is alleged in the bill that for more than two years next preceding the filing of the original bill of complaint,

William Hale Thompson was mayor, George F. Harding was comptroller and Michael J. Faherty was president of the board of local improvements of the city of Chicago; that Ernest H. Lyons, Edward C. Waller, Jr., and Arthur S. Merigold (hereinafter referred to as the experts) purported to be experts in the appraisal of real estate and were retained by the city in that capacity; that Charles M. Nichols and Arnold H. Brautigam also purported to be real estate experts; that Frank J. Koch was a co-partner of Brautigam, and that Percival B. Coffin was a political lieutenant of Fred Lundin. Fred Lundin is termed in the bill a political boss, who devoted his time and attention to the affairs of a political organization known as the Thompson-Lundin machine, or the Thompson faction of the Republican party, with which all of the defendants and real estate experts were affiliated. The bill alleges that for five or six years prior to the filing of the original bill, and subsequent thereto, this political organization controlled and directed the official acts and conduct of practically all the officers and employees of the city of Chicago, including the defendants, a majority of the members of the city council and a majority of the members of the board of local improvements. It is alleged that this political organization termed the Thompson-Lundin machine obtained and retained its power by awarding offices and favors to its adherents and by intimidating those who opposed it, and that it was made up of persons who would obey its orders in return for favors, regardless of their own political affiliations. The bill alleges that this political machine was organized primarily to promote the welfare of its own members and not the public welfare.

It is further alleged that on July 21, 1919, the city passed certain ordinances known as the City Beautiful bond ordinances, to provide funds by the sale of bonds to pay the city's portion of the expense of widening, extending and improving Western avenue, Ogden avenue, Robey street,

South Water street and Ashland avenue. These ordinances provided a total fund of $28,600,000, and copies were attached to the bill as exhibits. It appears that another ordinance was passed by the city submitting these five bond ordinances to a referendum vote, and at an election held November 4, 1919, these bond ordinances became effective by approval of a majority of the qualified voters voting on the question, and that many of the bonds were sold and the proceeds credited to certain corporate funds of the city called City Beautiful bond funds. The bill further alleges that both prior and subsequent to July 21, 1919, the city passed various local improvement ordinances for the making of certain parts of the City Beautiful improvements, and that the corporation counsel was directed by these ordinances to file petitions in court asking that steps be taken to ascertain the just compensation to be paid for property taken or damaged, also what property would be benefited by the improvement and the amount of such benefits. A list of the condemnation ordinances for the condemnation of lands under these City Beautiful improvements on the five streets above named is set forth in the bill, together with a statement that up to the time the original bill of complaint was filed no judgment had been entered in court for the condemnation of any private property or confirmation entered of any assessment on any of the five streets, excepting two named sections of Western avenue. The bill then proceeds to charge the defendants with unlawfully and wrongfully conspiring and confederating together for the purpose of defrauding the city of large amounts of money, charging that the defendants and divers other persons who were members of said political machine and whose names are to the complainant unknown, "unlawfully, wrongfully and fraudulently, and in violation of the duty owed by them and each of them to the city and the tax-payers thereof, conspired and confederated together for the purpose of wrongfully and unlawfully diverting for their own private

use, benefit and advantage a large amount of the moneys belonging to the city, including a large amount of the proceeds from the sale of City Beautiful bonds for the purpose of cheating and defrauding the city and tax-payers thereof, including the complainant, out of large sums of money which would otherwise be used and lawfully could only be used by the city for the City Beautiful improvements or for other municipal purposes and for the purpose of obtaining large sums of money from the city and tax-payers thereof, including complainant, to be distributed among persons composing said political machine or among persons whose adherence the persons comprising said political machine desired to obtain, whose names are to the complainant unknown. All of the acts hereinafter charged to the said Ernest H. Lyons and said Arthur S. Merigold, or either of them, or to any or either of the defendants herein, were done in pursuance of said conspiracy and confederation and in behalf of each, every and all of the said defendants and of said Ernest H. Lyons and Arthur S. Merigold and with the knowledge and consent of each, every and all of said defendants and of the said Ernest H. Lyons and said Arthur S. Merigold and for the purpose of accomplishing the object of said conspiracy and confederation." In support of the alleged conspiracy the bill then proceeds with the following charges, in substance:

1. That on February 5, 1920, upon the procurement of defendants and the three experts, the city council purported to pass a certain order, hereafter referred to as the order of February 5, 1920, purporting to authorize the board of local improvements to employ four real estate experts for such periods of time during 1920 as might be necessary, at the rate of one per cent of the value of the property and $50 per day for testifying in court on behalf of the city, such employment to be made upon securing the approval of the finance committee of the city council of the sum and rate of compensation to be paid.

2. That upon the procurement of the defendants and the three experts the city council further purported to approve the employment by the board of local improvements of said three experts at the rate of $50 per diem, and that neither the city council nor the finance committee approved their employment at any rate other than $50 per diem, or at any time during 1920 approved the employment of Nichols and Brautigam as real estate experts.

3. That in pursuance of said conspiracy, on or about March 2, 1920, the defendant Faherty, purporting to act in behalf of the city and under the authority of the order of February 5, 1920, pretended to employ the three experts, Lyons, Waller and Merigold, at the percentage rates fixed in said order, for a period of five years, beginning with 1920, to make appraisals of real estate on the five City Beautiful improvements; and that defendants claim this employment is evidenced by contracts in writing, being three letters purporting to bear date March 2, 1920, from Faherty, as president of the board of local improvements, addressed, respectively, to said three experts, and that Lyons and Merigold orally accepted the terms of employment and Waller accepted by his purported letter of March 8, 1920, addressed to Faherty. The bill alleges that these contracts of employment are contrary to the provisions of the order of February 5, 1920, and are null and void.

4. That on March 31, 1920, through the procurement of defendants and the three experts, the city council passed the annual appropriation bill for the fiscal year beginning January 1, 1920, and ending December 31, 1920, in which was appropriated the sum of $235,000 for the services of real estate experts in connection with the City Beautiful improvements, and that this was the only money appropriated by the city at any time for the payment of real estate experts for services rendered in 1920 on such improvements, and that, notwithstanding these facts and in pursuance of the conspiracy, the board of local improvements, under the

control of the Thompson-Lundin machine and the defendant Faherty, wrongfully arranged with the three experts to pay them one per cent of the value of property appraised by them in connection with the City Beautiful improvements, as is fraudulently claimed by the defendants to be provided for in the order of February 5, 1920, and the annual appropriation bill of 1920.

5. That the one per cent basis of payment was grossly and manifestly fraudulent and resulted in payments to the three experts of at least forty times more than the reasonable value of their services; that the defendants knew the services of the three experts were not worth more than $50 per day; that payment on a percentage basis was improvident and unbusinesslike, in that it induced the experts to place higher values on property in order to increase their compensation, and that because of these matters the order of February 5, 1920, and the annual appropriation bill of 1920, in so far as they authorize the employment of experts at one per cent of the value of the property, are null and void.

6. That on June 29, 1920, and on August 26, 1920, the city council passed ordinances repealing the order of February 5, 1920, and amending the annual appropriation bill of 1920 in so far as it purported to authorize the employment of experts on a percentage basis, but that the defendant William Hale Thompson, as mayor, vetoed said ordinances at the next regular meeting of the city council, November 10, 1920, by reason whereof the defendants were enabled to carry out the purpose of the conspiracy and pay such experts enormous sums of money from city funds.

7. That the three experts did, or claimed to have done, some sort of appraisal work in 1920 for the city pursuant to the purported arrangement with Faherty in connection with the City Beautiful improvements; that during the years 1920 and 1921, through the defendant Faherty, they presented bills to the city totaling $577,426.41 each,

for services unlawfully and wrongfully claimed to have been performed by them; that when the bills were presented the defendants knew the fair and reasonable value of the services rendered by the three experts to be worth no more than $15,000 each, and that any reputable appraiser would have rendered said services for not more than $15,000, but that notwithstanding these alleged facts the defendant Faherty fraudulently approved said bills and presented them to the city for allowance and the defendants Thompson and Harding fraudulently and unlawfully signed warrants for their payment.

8. That all of the sums paid out by the city, excepting sums of $52,960.04 to each of the three experts, were unlawfully and wrongfully paid out of certain "450-S" accounts, or so-called "blanket appropriations" made from the City Beautiful bond funds, which appropriations were in the following language: "For such other expenditures in connection with this improvement as may be ordered by the city council;" that the city council never at any time authorized any payments to the three experts from said 450-S accounts or out of any accounts other than $235,000, and that the 450-S accounts or blanket appropriations were null and void and contrary to law.

9. That at the time the warrants were issued, payable out of the 450-S accounts, the defendants caused to be stamped upon them a statement that such payments had been approved by the city council, and so induced the city treasurer to pay such warrants in the belief that their payment was authorized, when each of the defendants knew otherwise.

10. That Waller, Lyons and Merigold, the three experts, each appraised the same real estate, placing the same valuations on each parcel and each rendering identical bills for one per cent of the total, without deductions, so that the city, in fact, paid three per cent of the appraised value of each parcel of real estate appraised.

11. That a large portion of the $577,426.41 received by each of the three experts was not intended to be and was not retained by them as compensation for their services but in furtherance of such conspiracy was distributed in the years 1920 and 1921 among the various adherents of the Thompson-Lundin machine and to divers other persons whose support this machine desired to obtain, all of whose names are unknown to the complainant. This allegation is on the information and belief of complainant.

12. That said three experts, contrary to their purported contracts of employment and the order of February 5, 1920, did not personally make all the appraisals for the city, but on or about March 10, 1920, in pursuance of the conspiracy, employed the defendants Nichols and Brautigam, delegated part of the appraisal work to them and then unlawfully and wrongfully adopted the appraisals of Nichols and Brautigam as their own, with the result that at least $250,000 of the amount received by each of the three experts was for appraisals unlawfully made by the defendants Nichols and Brautigam, who likewise were paid large sums by said experts, being at least twenty times the value of their services, which sums were also not retained but were unlawfully distributed among political adherents of the Thompson-Lundin machine. This last allegation is upon information and belief of complainant.

13. That during the period described the defendants Arnold H. Brautigam and Frank J. Koch were co-partners engaged in the real estate business in Chicago, and that Brautigam, in pursuance of the conspiracy, paid Koch either one-third or one-half of the sum of $182,000 received by him; that Koch knew that the amounts received by him were received out of the city funds by Brautigam from the three experts, and also knew that the amount paid Brautigam was at least twenty times the reasonable value of services claimed to have been rendered by him.

14. That during this same time the defendant Percival B. Coffin was a political lieutenant of said Fred Lundin and a prominent member of the Thompson-Lundin machine; that out of the moneys received from the city by the defendant Ernest H. Lyons the latter paid to Coffin the sum of $70,000, for which the complainant is informed and believes Coffin performed no services whatever; that Coffin knew the money so paid to him had been received by Lyons from the city, as aforesaid, and that during the years 1920 and 1921 Coffin distributed a portion of the money so received by him among various political adherents of the Thompson-Lundin machine whose names are unknown to complainant.

15. That prior to the time of filing the original bill of complaint, the defendants Thompson, Harding and Faherty did not deny making said payments to the three experts but openly and notoriously boasted of what they had done and spent large sums of money for advertising in order to create a public sentiment behind which they might continue their unlawful practices and conspiracy, and that they openly declared and threatened to continue the payments of further enormous sums from the city to said experts, and that said experts also openly declared their purpose to ask and receive further huge sums for their services; that on or about February 18, 1921, the defendant Faherty reported to the city council that the three experts had appraised or would appraise real estate in connection with the City Beautiful improvements to such an extent that they would together be entitled to receive the sum of $270,000 more than the sums already paid them and that Faherty reported that he would O.K. their bills to that additional extent, being one per cent to each expert on same appraisals, and that complainant feared and believed that unless restrained by the court said experts, (or the expert Waller, as restricted by the amended bill,) aided by the defendants Faherty, Thomp-

son and Harding, would thus carry out their unlawful designs and fraudulently receive such payments from the city.

16. That all the matters and things set forth in the bill have for a long time prior to the filing of the original bill been known to the city, the city council, the officers of the city law department and to the board of local improvements, but that the city, its officers and employees have maintained that no unlawful acts have been committed, and have refused and continued to refuse during their incumbency in office to prevent the doings of the matters and things aforesaid or to proceed in the name of the city to require the defendants and the three experts to make restitution of the sums illegally paid out to them, and that the city law department was completely dominated and controlled by said political machine, and thus it would have been wholly useless for the complainant to have requested the city, its then officers or its law department to take action to prevent the accomplishment of the objects of the conspiracy or to obtain restitution from the defendants of the sums paid to the experts.

17. That the complainant did not know of the payment of such enormous sums to the experts until after the payments were completed and not until about February 1, 1921, when these payments became generally known; that shortly thereafter the finance committee of the city council began an investigation of such payments, in the course of which, on or about February 6, 1921, it first became known to such committee and to the complainant that the defendant Faherty, in behalf of the city, had entered into purported five-year contracts with the three experts; that considering its magnitude the original bill was prepared and filed within a reasonable time thereafter, June 24, 1921; that not until on or about April 17, 1923, did complainant learn that the defendants Brautigam, Koch, Coffin and Nichols had been parties to said conspiracy and had been paid money from the City Beautiful funds, and that complainant began its

own investigation of such payments and filed its amended bill making the four last named defendants parties on March 30, 1925.

The bill was not sworn to, waived answer under oath, and prayed for an injunction to restrain the experts, or such of them as are still parties to this proceeding, from rendering further bills to the city for services claimed to have been performed and to restrain the city from paying out anything further to said experts, and asks defendants to answer with particularity what parcels of real estate they claimed to have appraised; that an accounting be had of sums paid by the city to the three experts, and that each of the defendants be ordered to re-pay to the city the three several sums of $577,426.41. No temporary injunction was prayed for or issued against any of the defendants.

Separate answers to the bill of complaint were filed by Thompson and Harding, each in general denying all the allegations of conspiracy, fraud, collusion, or any connection with any and all the matters charged. Answers were also filed by the other defendants, and upon the filing of replications hearings were begun before a chancellor on March 2, 1926. On December 4, 1926, after the Statute of Limitations had run, the defendant Ernest H. Lyons was dismissed from the case, and on January 18, 1927, the case was also dismissed as to the defendant Arthur S. Merigold. Lyons paid $108,631 and Merigold paid $30,281 in consideration of their respective dismissals. The city gave these experts covenants not to sue and the experts gave releases to the city for other fees due to them from the city. At the close of complainant's case, on February 17, 1927, the appellants made separate motions to find the equities in their favor and for a decree dismissing the bill of complaint for want of equity. These motions were overruled and appellants stood by their motions. On June 29, 1928, the decree first above mentioned was entered against the remaining defendants, including Thompson and Harding. The findings

of this decree in general follow and support the allegations of the bill, in substance finding that the defendants and divers other persons had entered into a conspiracy for the purpose of wrongfully and unlawfully diverting large sums of money from city funds to their own private use and benefit, thus cheating and defrauding the city and tax-payers; that a further purpose of such conspiracy was to obtain large sums of money from the city to be distributed among persons composing the Thompson-Lundin political organization; that all the acts done by the conspirators, or either of them, were done in pursuance of said conspiracy and confederation and in behalf of each and all of said conspirators with the knowledge and consent of each of them and for a common purpose, and that all the money paid out to the three real estate experts in 1920 and in January, 1921, amounting to $1,732,279.23, was paid out in pursuance of said conspiracy, and that such payments were *ultra vires* and void. The decree further finds that Thompson and Harding, by reason of entering into said conspiracy, were each guilty of a breach of trust as public officers of the city and were guilty of fraud and corruption which were actuated by bad motives. The defendants Thompson, Harding, Faherty, Waller, Brautigam, Koch and Coffin were held jointly and severally liable for the sum of $1,732,279.23, less the sums of $108,631 and $30,281 paid by Lyons and Merigold, respectively, upon their dismissals from the suit, leaving a net principal sum of $1,593,367.23, to which the chancellor added interest of $652,237.29, making a total of $2,245,-604.52 which it was decreed the city of Chicago should have and recover from the defendants, jointly and severally, together with costs of suit. Separate appeals were taken by Thompson and Harding, and upon the circuit court certifying that the validity of an ordinance was involved and that public interest required an appeal to this court, the appellants perfected their appeals and on motion afterwards made the two causes were by order of this court consolidated.

It appears from the evidence that William Hale Thompson was elected mayor of the city of Chicago in April, 1915, and served as such during two terms until April, 1923, and that George F. Harding served as city comptroller during the second term of mayor Thompson's administration, from April, 1919, to April, 1923. Some years before the first Thompson administration certain civic leaders had formulated what was known as the Chicago Beautiful plan, which proposed, among other improvements, the widening and extending of certain principal streets in Chicago. In order to promote these improvements the Chicago Plan Commission, composed of prominent citizens, was created and organized, having as one of its objects the recommendation to proper city authorities of what improvements should be made in order to carry out the City Beautiful plan. Michael J. Faherty had been appointed by mayor Thompson in his first administration as president of the board of local improvements and continued as such during both of Thompson's terms as mayor.

Two prior improvements contemplated under the City Beautiful plan, the widening of Twelfth street and the Michigan avenue improvement, had been practically completed when in December, 1918, work was begun on the Ogden avenue improvement. Lyons, Waller and Merigold, the same three experts, worked on this Ogden avenue improvement on the basis of one per cent of the value of the property appraised, under authority of an order of the city council passed December 30, 1918.

With the passage by the city council of the five City Beautiful bond ordinances on July 21, 1919, bond issues were provided to secure funds to pay the city's share of the cost in making five improvements under the City Beautiful plan, viz.: Ogden avenue, $5,400,000; South Water street, $3,800,000; Ashland avenue, $5,800,000; Western avenue, $2,400,000, and Robey street, $9,200,000. On the same date the city council provided by ordinance for an ad-

ditional $2,000,000 bond issue to complete the Michigan avenue improvement, and also passed a referendum ordinance submitting the question of the issuance of the bonds provided by these respective ordinances to a vote of the people at an election set for November 4, 1919. The propositions submitted to the voters, respectively, specified the improvements, the amount of bonds to be issued, and were as follows: "Shall bonds or obligations of the city of Chicago, for the purpose of paying that portion of the costs and expenses to be borne by the city of Chicago, which has now accrued or may hereafter accrue in the matter of (improvement here described), including the construction of subways, pavements and sidewalks, all as may hereafter be determined by the city council, and the cost of engineering, valuations, legal services and court proceedings, in the sum of (amount here specified), be issued by the city council?" These bond issue ordinances were all approved at the election held November 4, 1919.

The record in this case is voluminous, the printed briefs and arguments alone consisting of four bound volumes with a total of over 1700 pages. As might be expected in such a case, there is much irrelevant matter. Aside from numerous subsidiary issues of law and fact, it is contended by appellee that the major issues involved may be grouped under five heads, viz.:

1. Was the compensation of the three experts fixed for the year 1920 at $50 per day instead of one per cent on the value of property appraised?

2. Were the "B" appropriations, aggregating $210,000, the only funds out of which the three experts might be paid?

3. Were the fees paid the three experts so excessive as to warrant the inference of fraud?

4. Did Thompson and Harding have knowledge of the illegal expenditure of City Beautiful bond funds?

5. Were Thompson and Harding (a) members of a conspiracy to defraud the city out of City Beautiful bond funds? and (b) was the object of that conspiracy accomplished?

We shall consider these points in the order named and proceed to a consideration of the evidence relating to the hiring of and rate of compensation to be paid to the three experts—the first of the major issues raised by appellee.

On February 4, 1920, the finance committee sent a communication to the city council, accompanied by a draft of an order authorizing the board of local improvements to employ, among others, four real estate experts at the rate of one per cent of the value of the property and $50 per day for testifying in court. This order, as drafted, was passed by a unanimous vote of the city council on February 5, 1920, and is as follows:

"Ordered, that the board of local improvements be and it is hereby authorized, in accordance with its request of January 8, 1920, to employ the following for such period of time during 1920 as may be necessary: Special counsel, six at $50 per day for each day employed. Real estate experts, four on the basis of one per cent of the value of property and $50 per day for testifying in court on behalf of the city. Rent experts, two at $50 per day for each day employed. Building experts, three on the basis of one per cent of the value of property and $50 per day for testifying in court on behalf of the city; at the rate of one and one-quarter per cent of the value of building for detailed, itemized estimate of cost of building without plans, and at the rate of two per cent of the value of building when plans, diagrams and details are furnished. Law clerks and stenographers, two at $125 per month. Investigators, two at $125 per month. For mechanical engineering services, $25,000. For court reporting, $25,000, and to charge the cost of same to such appropriations as may be hereafter made; and the city comptroller and city treasurer are hereby authorized and directed to pass pay-roll for same when properly approved by the president of the board of local improvements: *Provided, however,* that before retaining the services of any special counsel, real estate expert, build-

ing expert, rent expert or engineer under this order, the board of local improvements shall secure the approval of the committee on finance on the sum and the rate of compensation to be paid. And be it further ordered, that the employment by the board of local improvements of Eugene H. Dupee, Joseph J. Sullivan, William H. Dillon and Roger Faherty as special counsel at $50 per day; Edward C. Waller, Jr., Ernest H. Lyons and Arthur S. Merigold, real estate experts, at $50 per day, and Frank A. Mesce and Austin J. Lynch, building experts, at the rates above set forth, be and the same is hereby approved."

Mayor Thompson did not sign this order and it became effective without his signature.

Shortly following, on March 31, 1920, the city council passed the annual appropriation ordinance of 1920, therein making specific appropriation for four real estate experts, as follows: "For expert services: Real estate experts, four on the basis of one per cent of the value of property and $50 per day for testifying in court on behalf of the city, as per council orders of February 5, 1920." It is significant that in this appropriation it says, "as per council order of February 5, 1920," thus referring to that part, only, of the order which authorizes the employment of four real estate experts on the one per cent basis. It is therefore apparent that the city council itself on March 31, 1920, construed its order of February 5, 1920, as authorizing the employment of four real estate experts upon a one per cent basis and cleared up such ambiguity as might have remained as to their rates of compensation.

In the order of February 5, 1920, it is further provided "that before retaining the services of any special counsel, real estate expert, building expert, rent expert or engineer under this order, the board of local improvements shall secure the approval of the committee on finance on the sum and the rate of compensation to be paid." This provision is in direct conflict with the second and last pro-

visions of the same order, in both of which the council itself fixed the sums and rates of compensation to be paid. It would therefore not be within the power of a committee to override and in effect repeal the order of the city council by fixing any different sum or rate of compensation. In confirmation of its previous action the city council afterwards specifically provided in the annual appropriation ordinance for the one per cent rate of compensation of the four real estate experts, and this rate of compensation as so fixed must be considered as binding, so far as the expression of the city council is concerned. In this same connection the evidence shows that on December 30, 1918, the city council authorized the board of local improvements, in the Ogden avenue improvement, to employ these same experts, Waller, Lyons and Merigold, "on the basis of one per cent of the value of property and $50 per day for testifying in court on behalf of the city," and that these three experts accepted the employment under that order and worked on the Ogden avenue improvement on a percentage and not a per diem basis. This improvement had not been completed at the time of the February 5, 1920, order and was included in the City Beautiful bond ordinances approved by popular vote November 4, 1919, and was likewise included in the annual appropriation ordinance of 1920.

The record further shows that the board of local improvements, not only in the Ogden avenue improvement in 1918-1919 but also under the five improvements begun in 1920, employed these same three experts on the one per cent basis, plus $50 per day for testifying in court for the city. This last employment was evidenced by letters written March 2, 1920, by Michael J. Faherty, president of the board, embodying the authorized terms of their employment on the one per cent basis of compensation, the same as in the Ogden avenue work of 1919.

The record further shows that the question of fees to be paid to real estate and building experts was not a new

one when the city council passed its order of February 5, 1920, authorizing the employment of such experts on the percentage basis. For some years prior thereto the matter of fees upon a per diem or a percentage basis had been a frequent subject of discussion among the members of the finance committee and the city council. It appears that as early as January, 1918, a sub-committee appointed by the finance committee of the council held a public hearing to investigate this question of fees of experts, and that architects, real estate men, representatives of civic organizations and representatives from the Chicago and Cook County Real Estate Boards attended. A report of these hearings was prepared and submitted to the finance committee, with a recommendation that such experts be placed in the classified civil service of the city. However, following this report, the finance committee in December, 1918, prepared an order authorizing the board of local improvements to employ these same three experts on a percentage basis and recommended that action to the city council, and on December 30, 1918, the city council unanimously passed such an order authorizing the board of local improvements to employ Waller, Lyons and Merigold as real estate experts on the basis of one per cent of the value of property and $50 per day for testifying in court in behalf of the city. No claim is made in the bill of complaint before us that the above order of December 30, 1918, was in pursuance of any conspiracy, although it involved the same experts and the same rates of payment.

It is contended by appellee as its first major point that the city council by its order of February 5, 1920, did not authorize the employment of the three experts on the one per cent basis and that they were never lawfully employed to do appraisal work for the city on that basis. We must dissent from this view. As previously shown, the employment of these three experts on a percentage basis was first

recommended by the finance committee in December, 1918; was unanimously approved by order of city council December 30, 1918; was ratified by their employment by the board of local improvements on the Ogden avenue improvement early in 1919; was again recommended by the finance committee in February, 1920; was again unanimously approved by the second provision of the order of the city council of February 5, 1920, and was for a second time ratified by their employment by the board of local improvements in March, 1920, and subsequently confirmed March 30, 1920, in the annual appropriation ordinance. Any reasonable interpretation of these successive and concurring acts of the finance committee, board of local improvements and city council, both prior and subsequent to February 5, 1920, all fixing their pay on a percentage basis, when considered together, as they must be, produces the inevitable conclusion that long practice and definite authority were combined in the action of the board of local improvements in its employment of the three experts, Waller, Lyons and Merigold, on a basis of one per cent of the value of property plus $50 per day for testifying in court in behalf of the city. So far as the evidence shows, and outside of any questions of fraud or conspiracy, this was a valid contract for the year 1920, under the law, between the board of local improvements and the three real estate experts.

As its second major issue, it is next contended by appellee that the "B" appropriations, aggregating $210,000, were the only funds out of which the three experts might be paid, and that the payments made to them were in excess of appropriations legally available, and therefore void and *ultra vires*. The evidence shows that the services of the three experts had been rendered in connection with the five street improvements authorized by the City Beautiful bond ordinances, approved by a vote of the people on November 4, 1919. It is insisted by appellants that these bond ordinances passed by the city council and approved by the

vote of the people constituted in themselves an appropriation of the proceeds of the improvement bonds for the improvements in question, including the cost of making valuations and payment of real estate experts, and that sections 2 and 3 of article 7 of the Cities and Villages act, providing for the passing of an appropriation ordinance within the first quarter of the fiscal year, is not exclusive and does not prohibit the making of an appropriation by vote of the people pursuant to the constitution and statutes of the State.

Section 12 of article 9 of the constitution of 1870, after prohibiting municipal corporations from incurring indebtedness in excess of five per cent on the value of taxable property therein, provides: "Any county, city, school district or other municipal corporation incurring any indebtedness as aforesaid, shall before, or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same."

Article 5 of the Cities and Villages act prescribes the powers of the city council, and section 5 thereof, as renumbered in the amendatory act of 1929, provides that the city council shall have power "to borrow money on the credit of the corporation for corporate purposes, and issue bonds therefor, in such amounts and form, and on such conditions as it shall prescribe, * * * and before, or at the time of incurring any indebtedness, shall provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years after contracting the same."

The statute (Smith's Stat. 1929, chap. 24, pars. 661-4, p. 485,) further requires cities, villages and incorporated towns to submit ordinances authorizing bond issues to a vote of the people and prescribes the form and contents of the

separate ballot to be used, and the record shows that the five City Beautiful bond ordinances were submitted to a vote of the people under and in substantial compliance with these statutory provisions. It further appears that these bond ordinances were passed and approved by the people, and the bonds to be authorized were issued under the authority of section 12 of article 9 of the State constitution above quoted, and that each of the respective bond ordinances provides for and levies a tax to meet the payments of interest and installments of principal, as required by law.

Section 2 of article 7 of the Cities and Villages act provides, among other things, as follows: "The city council * * * shall, within the first quarter of each fiscal year, pass an ordinance, to be termed the annual appropriation bill, * * * to defray all necessary expenses and liabilities of such corporation. * * * No further appropriations shall be made at any other time within such fiscal year, unless the proposition to make each such appropriation has been first sanctioned by a majority of the legal voters of such city," etc. Then follows a provision permitting cities and villages with population of 100,000 or over, any time within the first half of the fiscal year, by a two-thirds vote of its legislative body, to pass additional appropriations of funds derived from any other source than the annual tax levies. Section 3 of said article in substance prohibits the city council, or any department or officer of the city, from adding to the corporate expenditures in any one year anything over and above the amount provided in the annual appropriation bill of that year except as otherwise provided, and further provides that no expenditure for an improvement to be paid for out of the general fund shall exceed in any one year the amount provided for such improvement in the annual appropriation bill. (Smith's Stat. 1929, chap. 24, pars. 101, 103.)

The foregoing provisions of article 7 are to be taken in conjunction with section 1 of article 8, which provides,

in substance, that the city council shall annually, on or before the third Tuesday in September in each year, ascertain the total amount of appropriations for all corporate purposes legally made and to be collected from the tax levy of that fiscal year and shall levy such amount by ordinance, specifying in detail the purposes for which such appropriations are made and amounts required for each purpose.

It is evident that the object sought by sections 2 and 3 of article 7 and section 1 of article 8, above described, is to place a curb upon tax-spending municipal bodies and to protect the people against extravagant expenditures and burdensome taxation. *Riverside Co.* v. *Howell,* 113 Ill. 256.

The Supreme Court of Nebraska had the same question that we are now considering before it for decision in *State* v. *Martin,* 27 Neb. 441, 43 N. W. 244. In that State the statutory provisions relating to the passage of an annual appropriation ordinance by the city council are substantially the same as the provisions of article 7 of the Cities and Villages act of this State. A bond issue for the purpose of certain waterworks was authorized by a vote of the people of the city and a contract was then made by the city for the construction of the waterworks. No appropriation for this purpose had been made in the annual appropriation bill and the mayor refused to sign the warrant in payment of the waterworks upon that ground. The court there held that since the voters had taxed themselves and appropriated the money it was not necessary to make any further appropriation for this purpose in the annual appropriation ordinance and that it was the duty of the mayor to sign the warrant.

The Supreme Court of Missouri has likewise passed upon this question in *Pryor* v. *Kansas City,* 153 Mo. 135, 54 S. W. 499. There the city council, under the city charter, had submitted to the voters a proposition for a bond issue to construct a city hall and sewer. At an election held for the purpose the people authorized the bond issue. The con-

tractor who constructed the sewer brought an action against the city to recover under his contract, and the city defended on the ground that no appropriation had been made for the work in the annual appropriation ordinance. The court held that no appropriation in the annual appropriation bill was necessary, since by the bond issue ordinance, "and the vote of the people held under the same, the proceeds of those bonds were put beyond the control of the common council either to apportion or appropriate."

It further appears that in the bond issues is the provision, "including the construction of subways, pavements and sidewalks, all as may hereafter be determined by the city council, and including the cost of engineering, valuations, legal services and court proceedings." The propositions submitted to the voters contained the same provision, with the omission of the word "including," following the word "and," which immediately preceded the words "the cost of engineering," etc. This reservation, "all as may hereafter be determined by the city council," applied only to the construction work mentioned immediately preceding the reservation, and cannot, under the rules of construction, be applied to the succeeding clause, "and including the cost of engineering, valuations, legal services and court proceedings." *Stevens* v. *Illinois Central Railroad Co.* 306 Ill. 370; *Dagan* v. *State,* 162 Wis. 353, 156 N. W. 153; *Traverse City* v. *Blair Township,* 190 Mich. 318, 157 N. W. 81; *Nebraska State Railway Com.* v. *Alfalfa Butter Co.* 104 Neb. 797, 178 N. W. 766.

Under the statute the city council is vested with authority to determine the character and locality of the construction work in the proposed improvement, and while it had no authority to employ engineers and real estate appraisers or to control and direct court proceedings, it did have authority to determine the character and location of subways, pavements and sidewalks and the manner of their construction. The reservation of power to the city coun-

cil contained in the bond ordinances and the propositions therefor related only to these matters and did not constitute any reservation of power to make a future appropriation of the bond funds.

The City Beautiful bond ordinances were approved by a vote of the people and effected a setting aside of public revenues for certain specified purposes. These ordinances, however, were not exclusive or self-executing. To carry their provisions into effect required supplementary action by the city council. Even after city funds have been voted by the people for public improvements, the city council is charged with general supervisory powers over their appropriation and expenditure. The annual appropriation bill for 1920 designated the funds to be expended in making the five street improvements. Funds set apart for different purposes were given certain account numbers, as 450-A-1, 450-B-7, etc. This same ordinance fixed the rate of pay for the "real estate experts on the basis of one per cent of the value of property and $50 per day for testifying in court, as per council orders of February 5, 1920, and March 10, 1920." Under each of these five improvements the city council designated certain 450-S accounts, "450-S" being the title of a general fund into which the largest part of the bond proceeds was apportioned. For instance, in the Ogden avenue street improvement bond fund the following appears: "450-S-12—For such other expenditures in connection with this improvement as may be ordered by the city council, $3,606,814." In the other bond funds the wording is the same as above stated, the only changes being as to amounts and account numbers, such as 450-S-10, 450-S-32, etc. The experts were paid out of these general funds designated as the 450-S accounts at the rate of one per cent of value of property appraised. This rate of pay was specifically provided by the appropriation bill and fell within the description of the 450-S accounts as such expen-

diture had been "ordered by the city council" on February 5, 1920, and March 10, 1920. Such payments were therefore legally made. The designation of certain accounts by number and letter was apparently made for the purpose of convenience in book-keeping and auditing. The record speaks for itself and unmistakably shows that these bond funds were legally appropriated for each of the improvements and that the city council, in the exercise of its supervisory powers over all corporate expenditures, authorized the payment of one per cent fees to these three experts for the year 1920.

Appellee asserts in its third major premise that the fees paid to each of the three experts were so excessive as to warrant an inference of fraud, and argues that Thompson and Harding should have known from the size of the fees not only that they were excessive but also that the funds of the city were being misappropriated. While the fees were grossly excessive for the services rendered, the city council by unanimous vote fixed the fees to be paid the real estate experts and directed their employment and payment. Its action was legislative and is not subject to review by the court, in the absence of any proof to establish the allegations of the bill that the city council was dominated or controlled by these defendants. There is no evidence whatever that the city council was prompted by improper motives in the passage of the order and ordinance in question. The motives of a city council in the exercise of its legislative powers cannot be made the subject of inquiry by the courts. (*Murphy* v. *Chicago, Rock Island and Pacific Railway Co.* 247 Ill. 614.) Whether, in the light of subsequent events, good judgment was exercised by the city council in authorizing and directing the employment of the real estate experts and fixing their compenstion is a question with which the court has no concern.

The fourth and fifth points raised by appellee and designated by it as major issues will be considered together since both involve the conspiracy charge and deal with interre-

lated facts. Question 4 is: "Did Thompson and Harding have knowledge of the illegal expenditure of City Beautiful bond funds?" and question 5 is: "Were Thompson and Harding (a) members of the conspiracy to defraud the city out of City Beautiful bond funds, and (b) was the object of that conspiracy accomplished?"

In analyzing the evidence with respect to the alleged conspiracy certain fundamental rules of law applicable to this case must be pointed out. It first must be noted that the burden of proof is upon the complainant to prove the appellants guilty of conspiracy, as charged in the bill of complaint, by clear and convincing evidence. The decree in this case must stand or fall upon the charges made by and the evidence produced under the second amended and supplemental bill of complaint. There is no direct evidence in this case to prove the conspiracy, and while conspiracy may be proved by indirect or circumstantial evidence such evidence must be clear and convincing, and if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved and to enter a decree dismissing the bill for want of equity. (*Wolf* v. *Lawrence*, 276 Ill. 11; *Mosbarger* v. *Brown*, 313 id. 238; *McKennan* v. *Mickelberry*, 242 id. 117; *Valbert* v. *Valbert*, 282 id. 415.) It may also be observed that as the conspiracy charged against the appellants necessarily involves official corruption on their part, the complainant, in its proof of the conspiracy, must overcome the presumption of good faith and the proper discharge of official duties which operates in favor of the appellants in this case. The rule is well established that public officials in the performance of official acts are presumed to act in good faith and with honest motives. *Hallett* v. *City of Elgin*, 254 Ill. 343; *Wolbach* v. *Rubens*, 307 id. 186; *People* v. *Chicago, Burlington and Quincy Railroad Co.* 314 id. 445; 22 Corpus Juris, 135.

It is essential to a clear understanding of the evidence to also note that in this case only affirmative acts of the defendants, in connection with others, to convert public money to their own use are charged as the alleged acts of conspiracy. A mere neglect or omission to do anything is not charged against defendants in any of the bills of complaint, none of which assert any right of recovery for nonfeasance or failure or neglect to do any acts defendants should have done. The charge being conspiracy to unlawfully divert public funds to their private use, the proof must show that appellants had entered into a combination to accomplish by concerted action the unlawful withdrawal and appropriation of the city's money for the purposes described in the bill of complaint. (*Spies* v. *People*, 122 Ill. 1.) This requires a knowing co-operation on their part in the alleged unlawful enterprise. Corpus Juris (vol. 12, p. 639,) thus states the rule: "In order to establish a conspiracy, evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." And this court in *Evans* v. *People*, 90 Ill. 384, said: "To authorize a conviction for conspiracy there must be proved to have been more than one person guilty." (Citing cases.) In Wharton's Criminal Law, (vol. 2, 7th ed. 2355,) it is said: "It needs something more than proof of a mere passive cognizance of fraudulent or illegal action of others to sustain conspiracy. There must be something showing active participation of some kind by the parties charged." This combination of persons in a common design to accomplish an unlawful purpose constitutes such unity of action that when the fact of conspiracy is established the acts and declarations of one co-conspirator are considered in the law as the acts and declarations of the others; (*People* v. *Halpin*, 276 Ill. 363;) and such unity of action in furtherance of a common design must be established by proof of the fact of conspiracy before such

acts and declarations are admissible. (*Spies* v. *People, supra.*) It will therefore be seen that to sustain the decree of the circuit court against the appellants, or either of them, the record must show by clear and convincing evidence that the appellants, or either of them, by assent of mind and concert of action, in pursuance of a common design, participated in the accomplishment of the unlawful acts and objects alleged in the bill of complaint.

With this preliminary review of legal principles that must guide the court in its determination of the case we will now proceed to a consideration of the evidence adduced in support of the allegations of conspiracy.

Appellee relies upon certain circumstantial evidence as showing that appellants were members of the alleged conspiracy, but neither such evidence taken as a whole, nor the circumstances taken singly, indicate that either Thompson or Harding was a member of the alleged conspiracy. As a matter of fact, all the circumstances which are pointed out by appellee as connecting appellants with the situation in any way are such that they would, at most, indicate that perhaps they received some notice or warning from newspaper articles, or otherwise, that the experts were receiving excessive or exorbitant fees, and these circumstances are for the most part utilized by appellee in the attempt to establish that notice or warning was given to Thompson and Harding in ample time to have permitted them to make an investigation or take some step toward stopping the alleged unlawful expenditures. In other words, the tenor of the argument of the appellee in its use of these circumstances amounts to a tacit confession that these circumstances, at most, indicate that Thompson and Harding knew, or should have known, that others were diverting the city's funds and violated their duty in failing to put a stop to such diversions after notice or warning.

The statement of facts which is the basis of appellee's argument purports to be complete and sets forth all the

circumstances relied upon by appellee to show the connection of Thompson and Harding with the alleged conspiracy. It is therefore not necessary to go outside that statement of facts for the purpose of considering the evidence relied upon in this respect. Throughout this statement the circumstances relied upon as showing notice or warning to Thompson and Harding clearly indicate appellee's own belief that but for these alleged notices or warnings appellants would have known nothing of the alleged conspiracy and unlawful diversion of funds. A few of the numerous examples of this kind will be referred to. Thus it is said: "It was in the month of February, 1920, that there commenced to appear in the columns of the *Chicago Daily News* and in the *Chicago Tribune* a series of articles which, combined with other salient facts and circumstances, show knowledge on the part of Thompson and Harding of the essential facts concerning the payment to real estate and building experts. Harding was a subscriber to the *Tribune*, while Thompson was a consistent reader of the same newspaper and of the *Daily News* during the year 1920."

With the foregoing statement as a premise, appellee's statement of facts throughout refers to numerous newspaper articles appearing in the *Daily News* and *Tribune*. The record contains a total of seventy-four such articles prior to November 10, 1920. As above stated, these newspaper articles are referred to for the purpose of charging both Thompson and Harding with knowledge of the alleged unlawful acts from the time the articles appeared. In other words, these articles are relied upon as constituting notice or warning to Thompson and Harding that others were unlawfully diverting moneys of the city. This is, of course, inconsistent with the theory of the bill that Thompson and Harding were parties to the conspiracy from its inception and were active in carrying out its objects. With these newspaper articles as a basis, it is contended by appellee that Thompson and Harding received such notice or warn-

ing of alleged unlawful diversions of funds that they were guilty of a breach of duty, as officers of the city, in failing to investigate and stop such practices. This purpose is indicated by the manner in which the articles are introduced in the statement of facts. Thus, in introducing a *Tribune* article of June 6, 1920, appellee says: "Now a word on press comments as bearing on knowledge on the part of Thompson and Harding." In similar fashion appellee refers to two articles in the *Daily News* and draws the conclusion that Thompson must have read these articles and thus secured notice of the facts therein contained, because it says "both are numbered among the articles upon which Thompson based his libel suit against the *Daily News*." Likewise, knowledge of certain testimony of Faherty before the finance committee in January, 1921, is charged to Thompson and Harding by the following statement: "While these finance committee meetings were being held and publicity was being given to them and to the payments made to the experts, the division of the proceeds of the 'S' warrants continued as heretofore described." Appellee thus points to the issuance of the "S" warrants by the comptroller's office, after such publicity, as evidence of the fact that the comptroller, Harding, knew, or should have known from the publicity, that some wrongful act was being perpetrated by others. In other words, appellee seeks to charge him with intentional and deliberate participation in the alleged conspiracy and unlawful conversion. In the same way appellee seeks to charge Thompson and Harding and other city officers with knowledge of the contents of certain ordinances and resolutions of the city council by referring in its brief to evidence that copies of all council proceedings were regularly sent to the mayor and heads of the various departments.

In dealing with an ordinance passed on June 29, 1920, and placed in the hands of the mayor for approval or veto, the appellee contends that since this ordinance was in the

mayor's hands for several months before it was vetoed, this constituted notice to the mayor of the contents of an order of February 5, 1920, and of the terms of an appropriation bill in the repealing ordinance.

Again, in the effort to connect Thompson and Harding with the alleged conspiracy we find the following: "Roche, the first accountant in the board of local improvements, issued all of the vouchers. He continued in that position to the close of the Thompson administration. In the comptroller's office, Miller, Callahan, Lane and Schweitzer, who passed on the same vouchers, retained their respective positions. Schneiderbach, who stamps each 'S' warrant with the words, 'Charges against this account approved by the city council,' was not discharged. Neither were proceedings instituted at the behest of either Thompson, Harding or Faherty to recover from the five experts what had thus been paid them." The contention would here seem to be that Thompson and Harding, after notice of what the city employees had done, should have discharged them, and that they were guilty of a breach of duty in failing to do so.

It is attempted in numerous other instances to connect Harding, as comptroller, with the alleged conspiracy by showing that certain employees in his office and in other city offices made erroneous statements, in the absence of which the experts could not have obtained the large fees, and that Harding knew, or should have known, of these things. Thus, the fact that an employee in his office affixed a stamp to warrants issued by the office that "charges against this account approved by the city council," when, as alleged, no such approval had been obtained, is relied upon as showing that Harding knew, or should have known, what was being done. However, an examination of the evidence fails to disclose any proof of fraud or conspiracy in these transactions, and there is no proof that Harding or Thompson took any part in the issuance of any of the warrants, either by handling or signing them. It appears

that the vouchers to the three experts took the usual course of procedure in the comptroller's office, so far as their handling by clerks and deputies is concerned. There was considerable discussion and several conferences among the various employees in the comptroller's office as to whether the vouchers were properly chargeable to the "S" accounts. Included in these conferences were Joseph Harvey, city auditor, who had been in the comptroller's office for twenty-five years; Louis E. Gosselin, deputy comptroller; Powers, chief accountant; Westfall, expert accountant; Lane and Schweitzer, classification clerks, and Callahan, auditing clerk. It appears that Harvey, a civil service employee, was charged with the duty of passing upon vouchers and approving or disapproving them. The record shows that when these expert fee vouchers reached the comptroller's office and some question arose as to whether they were chargable to the "S" account, either Harvey or Gosselin requested an opinion from the corporation counsel's office in regard to the matter. On July 10, 1920, two days after the board of local improvements had forwarded the vouchers to the comptroller's office, an opinion signed by Leon Hornstein, an assistant corporation counsel, approved by the corporation counsel, was given in compliance with such request from the comptroller's office. In that opinion Hornstein said: "Your request for advice concerning the validity and effect of an ordinance passed by the city council on June 29, 1920, which seeks to annul portions of the appropriation bill and to rescind an order passed on February 5, 1920, was referred to the undersigned for consideration and reply. Your inquiry is directed practically to the question whether you should honor certain vouchers drawn against the street improvement bond funds for services of real estate experts which have been presented for payment." The opinion then discusses the validity of said ordinance of June 29, 1920, and states that inasmuch as the ordinance is an attempt to amend the appropriation ordi-

nance after the time had expired within which an amendment may be made, the ordinance was invalid. The opinion then concludes: "Therefore we are constrained to advise you, in answer to your question, that vouchers drawn in due form for services rendered in accordance with the appropriations in question should be honored. We return the said vouchers herewith." While the opinion did not expressly state, in so many words, that the vouchers were lawfully chargeable against the "S" account, the opinion was apparently accepted in the comptroller's office as having that effect.

Harvey was called as a witness by the complainant and on cross-examination he testified that he acted honestly and conscientiously in the matter, and that he audited and approved the vouchers in the belief that they were properly drawn on the "S" account. He said that he had discussed the question with different employees in the office, and the final decision as the result of such discussion was that the vouchers were properly drawn against the "S" account. He also stated that he did not recollect whether he or Gosselin requested the Hornstein opinion of July 10, but he thought it quite likely that this opinion had something to do with his passing the vouchers. In his direct examination he stated that he talked to Harding about the vouchers and told him that the "S" appropriation had a string tied to it and that he (Harvey) did not think they ought to be approved, and that when he stated that Faherty had O.K.'d them, Harding replied, "Well, I think Faherty is responsible and they ought to go along." On cross-examination Harvey testified that three years before, in November, 1923, he testified before the grand jury of Cook county in the case of People *vs.* Brautigam in regard to these vouchers and warrants, and that when the vouchers came along for payment he first thought there was something irregular about them, but after conferring with Gosselin, Powers and Westfall they came to the conclusion there was nothing

wrong and passed the vouchers. He then stated that never at any time had he discussed the matter with Harding, because, as he stated, the comptroller, as a rule, knows nothing about these things personally as to charging to the various accounts. This testimony was given by Harvey at a time when the matter was evidently fresher in his mind than at the time he testified in this case, and we are inclined to regard his testimony as given before the grand jury as the more trustworthy. On re-direct examination, in an attempt to explain the discrepancy between his testimony on the trial and the testimony that he gave before the grand jury several years before, Harvey again stated that they did not discuss these matters with Harding, giving as a reason that he did not think Harding then, or at any time, grasped the situation. It also clearly appears from the evidence that any suggestion from Harding, if such a suggestion had in fact been made, had no influence with Harvey or the other men with whom he discussed the matter, in coming to a decision that the vouchers were properly drawn against the "S" accounts. It clearly appears from Harvey's testimony that it was the result of the deliberations of and discussions between himself, Gosselin and others concerning these vouchers, that, as he expressed it, "we decided they should be paid."

Harvey's testimony, upon his direct examination in the trial of this case, that he spoke to comptroller Harding about the vouchers is the only evidence in any way connecting the city comptroller himself with the matter or tending to show that the latter had any knowledge of these vouchers. However, accepting the testimony of Harvey that he talked to Harding about the vouchers for whatever it is worth, it is clear from Harvey's own statements that such talk with Harding had no weight whatever with him in reaching the conclusion that the vouchers were properly chargeable against the "S" account. Such testimony, therefore, is of no consequence in determining the city comp-

troller's liability in this case. There is no claim that mayor Thompson had any knowledge of these vouchers or of their approval in the city comptroller's office.

After the decision that the vouchers were properly chargeable against the "S" account Harvey approved the vouchers and they were delivered to the warrant writer to prepare the warrants. It appears from the evidence that for more than twenty years it has been the custom and practice in the city of Chicago to have printed blank forms of warrants upon which the signatures of the mayor and city comptroller are lithographed, and that neither the mayor nor the city comptroller personally signs such warrants. After the warrants were prepared by the warrant clerk upon the printed blanks bearing the lithographed signatures of the mayor and the city comptroller the warrants were personally signed by Louis E. Gosselin, deputy comptroller, who is a city employee under civil service and not the appointee of the city comptroller. The evidence also shows that the warrant writer in preparing the warrants, seeing the notation on the vouchers, "See council proceedings February 5," concluded that the council proceedings constituted an order of the city council authorizing the payment of the vouchers out of the "S" account. He accordingly stamped on each of the warrants, "Charges * * * approved by the city council." This stamp was likewise put upon all subsequent warrants issued upon the real estate experts' vouchers. The warrants were afterwards issued by the paying teller to the payees, who presented them to the city treasurer and received the money thereon. After it was determined in the comptroller's office that these first three vouchers of the experts were chargeable against the "S" accounts and warrants were issued for their payment, all other vouchers of the experts afterwards presented for similar services were likewise approved and warrants issued thereon were paid by the city treasurer. It is clear from the evidence that neither mayor Thompson nor city comp-

troller Harding ever saw the warrants thus issued or had anything to do personally with them or had any knowledge whatsoever of the stamp placed upon the warrants by the warrant writer, "Charges * * * approved by the city council." The evidence shows that in the city of Chicago warrants requiring the signatures of the mayor and the city comptroller amount in number to more than half a million annually, and that it would be practically impossible for the mayor and city comptroller to personally sign such large numbers of warrants, and therefore the custom was inaugurated many years ago to have *fac-simile* signatures of the mayor and city comptroller lithographed on all warrants and the personal signature of the deputy comptroller endorsed thereon.

It is manifest from the evidence relating to the vouchering of the experts' bills and the delivery of warrants on the same to the experts that no proof of fraud or conspiracy is shown. The evidence shows that neither the mayor nor the city comptroller had anything to do with the passing of these vouchers or the issuing of the warrants. The presence of the *fac-simile* lithographed signatures of the mayor and the city comptroller on the warrants was, as we have seen, in accordance with a custom and practice followed for many years, and appellants cannot properly be charged with membership in or knowledge of a conspiracy to defraud the city because they followed this long established custom and practice.

Letters dated July 13, 1921, were sent to Harding and Gosselin, his deputy comptroller, at Harding's office, requesting them to appear before the sub-committee of the city council with respect to the expert fee investigation. Harding did not appear, and from his failure to respond to this request it seems to be contended that he was a member of the alleged conspiracy. There is no evidence that Harding ever received the letter. The record shows that he was out of the city at least from the date of the letter, and it

does not appear whether he left the city before or after the letter reached his office. The evidence further shows that Harding had not seen the letter on July 18, 1921, because Gosselin informed the sub-committee that he could not produce certain warrants until Harding had seen the letter and knew what was to be done. Battis, the chief clerk in Harding's office, refused to permit an accountant in the office of the finance committee to examine Harding's books a second time on the ground that "any information concerning the books would have to be requested through formal communication from the staff" of the finance committee. There is no showing whatever that Harding directed or knew of this refusal of the employee in his office to permit an examination of the books.

Another circumstance from which, it is contended, Thompson must have known of the conspiracy was, that an ordinance of June 29, 1920, attempting to repeal the prior appropriation ordinance of 1920 with respect to the experts' fees remained in Thompson's hands, neither approved nor vetoed, for several months, during which time the city council was not in session. Thompson vetoed this ordinance upon advice of the corporation counsel that the city council was without power to repeal the appropriation ordinance at that time. The corporation counsel is not charged to have been a member of the alleged conspiracy, and Thompson's act in vetoing this ordinance cannot be taken as any indication that he was a party to the conspiracy and therefore did not want the former appropriation for expert fees repealed.

In its charges the appellee also contends that the appellants "procured" the passage of the council order of February 5, 1920, authorizing the employment of the three experts, and the appropriation ordinance of March 31, 1920. There is no evidence in the record whatever to show that either Thompson or Harding had anything to do with these ordinances or with the making of appropriations to the

board of local improvements, or that they even knew what such appropriations were. Mayor Thompson failed to sign the order of February 5, 1920, and it went into effect without his approval, and no evidence appears that either he or Harding had any thing to do with the preparation of these ordinances or urged any of the aldermen to vote for their passage.

All of these and similar circumstances relied upon as proof that Thompson and Harding were members of an alleged conspiracy and were guilty of intentional, deliberate and wrongful conduct fall short of their mark. It is not enough to contend, as appellee does, that the various acts of Thompson and Harding in the course of their duties as public officers dovetailed with certain acts of the alleged conspirators in diverting public funds. In other words, it is not enough to say that in the absence of the actions of Thompson and Harding as public officers the money could not have been wrongfully diverted. On the same argument the city treasurer, who is admittedly innocent of any wrongdoing, could be found clearly guilty, since he permitted the city's funds to be used in payment of the vouchers. Clearly, the experts could not have obtained the large fees in the absence of action of the city treasurer, and yet it would be illogical to argue that for this reason the city treasurer must have been a member of the alleged conspiracy. It would likewise be illogical in this case to assume that Harding is guilty because the warrants and vouchers passed through his office and were approved by the city employees and because his *fac-simile* signature appeared upon the warrants, and in the absence of this action by Harding's office the experts could not have received their pay. The same is true as to the contention that Thompson is liable because his lithographed signature appeared on the warrants. These circumstances, taken at their highest evidential value, could at most only indicate that Thompson and Harding were guilty of negligent omission in failing to prevent the issu-

ance of these warrants bearing their *fac-simile* signatures in payment of the experts' fees. As we have said before, however, Thompson and Harding are not charged with negligent omission to perform their duties but are charged with conspiracy involving deliberate, intentional wrongdoing. A review of the evidence fails to disclose any convincing proof that the appellants Thompson and Harding, or either of them, were guilty of conspiring together or with other persons for the purpose of defrauding the city.

Appellee contends vigorously and at great length that the decree may be sustained as to Thompson and Harding even in the absence of proof that they were members of the conspiracy, as alleged in the bill, on the ground that they were guilty of a violation of their duties and a breach of trust as public officers. It is well settled that the pleadings, the proof and the decree must correspond. Pleadings without proof to support them are without avail, and likewise proof without pleading is not sufficient to sustain a decree. The bill is based solely upon the theory that these defendants were parties to an alleged conspiracy and that they actively participated in carrying it out. It is based on the theory that these defendants were guilty of actual, intentional, wrongful acts. As we have stated, the evidence fails to establish these allegations. There is no proof that these defendants were parties to the alleged conspiracy, that they intentionally or deliberately took any part in the alleged wrongful diversion of the city's funds, or that they were guilty of any wrongful action. Viewing the proof in its strongest light, it would only indicate that these defendants, after notice, should have known that a large amount of fees was being paid to the experts and that they should have taken some action to prevent further payments. The proof, therefore, amounts to nothing more than negligent non-action on the part of these defendants—failure to do something to prevent further payments being made. Proof of this nature does not sustain the allegations of the bill.

Allegations of wrongful, positive action are not proved by evidence of non-action, whether negligent or otherwise. The rule is well settled that charges of willful misconduct, such as fraud or other malfeasance, cannot be sustained by proof of mere omission of duty—nonfeasance. (*Becker* v. *Billings,* 304 Ill. 190; *Adams* v. *Gill,* 158 id. 190.) This rule has been recognized in a number of cases holding that a cause of action based upon active wrongdoing is separate and distinct from a cause of action based upon negligent non-action. Thus, in the following cases the two causes of action have been held to be separate and distinct: Refusal of a railroad to receive goods for shipment and negligent failure to deliver goods promptly after receiving them; (*Phelps* v. *Illinois Central Railroad Co.* 94 Ill. 548;) negligent act of defendant's servants in operating a train at a high and dangerous rate of speed and negligence of the defendant in retaining in its service incompetent and careless servants; (*Chicago City Railway Co.* v. *Leach,* 182 Ill. 359;) the misappropriation of money collected by a postmaster and the negligence of the postmaster in permitting another person to procure and fill out blank forms and obtain money thereon; (*United States* v. *Norton,* 107 Fed. 412;) forcible and wrongful eviction of a passenger by a porter and negligent mistake of the porter in calling the name of the wrong station, inducing the passenger to leave the train voluntarily; (*Alabama Great Southern Railroad Co.* v. *Smith,* 81 Ala. 229, 1 So. 723.) These authorities demonstrate that if a cause of action is alleged for wrongful, intentional misconduct and the proof establishes only negligent non-action there is a fatal variance.

Because of a variance between the allegations of the bill and the proof it was erroneous to enter a decree against these defendants finding them guilty of conspiracy, and for this reason the decree should be reversed with respect to these defendants. Even assuming, however, that on this bill recovery could be had against these defendants on proof of

mere non-action or failure to perform a duty, it is clear that no such decree should have been entered against these defendants under all the facts in this case. The evidence shows that the three experts received from the city all the fees in question. There is no evidence whatever that Thompson and Harding received any of these fees. On the contrary, the evidence produced by the complainant upon the dismissal of the defendants Lyons and Merigold purports to show in detail what these two experts did with the moneys they received from the city, and since that showing accounts for the disbursement of the moneys by the experts to other persons or for other purposes, it indicates clearly that none of the moneys received by those two experts were paid to or received by Thompson and Harding, or either of them.

Whether the settlement made by the city with Lyons and Merigold, coupled with the dismissal of those two defendants out of the case after the running of the Statute of Limitations, had the effect of releasing all liability of the remaining defendants need not be decided, in view of our holding that Thompson and Harding were not shown to be parties to the alleged conspiracy, and were, at most, guilty of negligent non-action or failure to perform a duty.

Numerous other errors are assigned by appellants for the reversal of the decree, but in view of the conclusion we have reached it is unnecessary to consider the other points raised.

The record fails to establish any liability against the appellants or either of them. The chancellor should have entered a decree dismissing the bill of complaint as to them.

For the reasons given, the decree of the circuit court is reversed.                          *Decree reversed.*