(No. 19785.—

THE TRIBUNE COMPANY, Defendant in Error, *vs.* WILLIAM H. THOMPSON *et al.*—(MICHAEL J. FAHERTY *et al.* Plaintiffs in Error.)

*Opinion filed October 23, 1931.*

BUSBY, WEBER, MILLER & DONOVAN, GEORGE W. MILLER, W. I. DEFFENBAUGH, and ROGER FAHERTY, for plaintiff in error Michael J. Faherty; CHESTER E. CLEVELAND, for plaintiff in error Percival B. Coffin.

KIRKLAND, FLEMING, GREEN & MARTIN, (WEYMOUTH KIRKLAND, HOWARD ELLIS, WILLIAM WILSON, and J. B. MARTINEAU, JR., of counsel,) for defendant in error.

Mr. JUSTICE HEARD delivered the opinion of the court:

By this writ of error Michael J. Faherty, Percival B. Coffin and Edward C. Waller, Jr., seek a reversal, as to them, of a decree of the circuit court of Cook county which was considered by this court at a former term. For a full statement of the pleadings, issues, legal points involved and facts as shown by defendant in error in its evidence in chief, the decree of the court and the decision of this court as to the legal questions involved, reference is made to the opinion filed in that case, which is reported as *Tribune Co.* v. *Thompson,* 342 Ill. 503. This case differs from that, in that Thompson and Harding offered no evidence in their behalf but rested their defense on their claim of failure of proof on the part of defendant in error, while Faherty and Coffin testified, denying participation in the alleged conspiracy.

In its brief and argument in this case defendant in error says: "A word, now, as to the issues involved in this proceeding. They are essentially the same as stated in the matter of the appeals of Thompson and Harding. On page 11 of our statement in that case we presented them, as follows:

" '1. Was the compensation of the three experts fixed for the year 1920 at $50 a day instead of at one per cent of the value of the property appraised? On this question the complainant maintains the affirmative.

" '2. Were the 'B' appropriations, aggregating $210,000, the only funds out of which the three experts might

be paid? On this issue the complainant maintains the affirmative.

" '3. Were the fees paid the three experts so excessive as to warrant the inference of fraud? On this question the complainant maintains the affirmative.

" '4. Did Thompson and Harding have knowledge of the illegal expenditure of City Beautiful bond funds? On this question the complainant maintains the affirmative.

" '5. Were Thompson and Harding (*a*) members of a conspiracy to defraud the city out of City Beautiful bond funds? and (*b*) was the object of that conspiracy accomplished? On these two interrelated questions the complainant maintains the affirmative.'

"If to the names of Thompson and Harding recited under numbers (4) and (5) there be added the names of Michael J. Faherty and Percival B. Coffin, the five issues so presented are the issues involved in this writ of error.

"The charge of conspiracy contained in the bill of complaint may well be stated here: That defendants 'unlawfully and fraudulently, and in violation of the duty owed by them and each of them to the city and the tax-payers thereof, conspired and confederated together for the purpose of wrongfully and unlawfully diverting for their own private use, benefit and advantage a large amount of the moneys belonging to the city, including a large amount of the proceeds from the sale of City Beautiful bonds, for the purpose of cheating and defrauding the city and tax-payers thereof, including the complainant, out of large sums of money which would otherwise be used, and lawfully could only be used, by the city for the City Beautiful improvements or for other municipal purposes, and for the purpose of obtaining large sums of money from the city and tax-payers thereof, including complainant, to be distributed among persons composing said political machine or among persons whose adherence the persons comprising said politi-

cal machine desired to obtain, whose names are to the complainant unknown.' "

As to the first two of these questions, they are answered in the negative in *Tribune Co.* v. *Thompson, supra,* it being there said: "The experts were paid out of these general funds designated as the 450-S accounts at the rate of one per cent of value of property appraised. This rate of pay was specifically provided by the appropriation bill and fell within the description of the 450-S accounts as such expenditure had been 'ordered by the city council' on February 5, 1920, and March 10, 1920. Such payments were therefore legally made. The designation of certain accounts by number and letter was apparently made for the purpose of convenience in book-keeping and auditing. The record speaks for itself and unmistakably shows that these bond funds were legally appropriated for each of the improvements and that the city council, in the exercise of its supervisory powers over all corporate expenditures, authorized the payment of one per cent fees to these three experts for the year 1920."

As to the third question it was said in *Tribune Co.* v. *Thompson, supra:* "Appellee asserts in its third major premise that the fees paid to each of the three experts were so excessive as to warrant an inference of fraud, and argues that Thompson and Harding should have known from the size of the fees not only that they were excessive but also that the funds of the city were being misappropriated. While the fees were grossly excessive for the services rendered, the city council by unanimous vote fixed the fees to be paid the real estate experts and directed their employment and payment. Its action was legislative and is not subject to review by the court, in the absence of any proof to establish the allegations of the bill that the city council was dominated or controlled by these defendants. There is no evidence whatever that the city council was prompted by improper motives in the passage of the order and ordi-

nance in question. The motives of a city council in the exercise of its legislative powers cannot be made the subject of inquiry by the courts. (*Murphy* v. *Chicago, Rock Island and Pacific Railway Co.* 247 Ill. 614.) Whether, in the light of subsequent events, good judgment was exercised by the city council in authorizing and directing the employment of the real estate experts and fixing their compensation is a question with which the court has no concern." The only alleged illegal expenditure of the City Beautiful bond funds being the payment of the fees to the experts, the fourth question must be answered in the negative, as it was held in *Tribune Co.* v. *Thompson, supra,* that such fees were legally paid.

The City Beautiful plan was the most important, elaborate and extensive local improvement ever undertaken by the city of Chicago. This project did not originate with plaintiffs in error or the Thompson administration but it had been formulated by the Chicago Plan Commission, composed of some of Chicago's most prominent citizens and civic leaders, without regard to their political affiliations. Charles H. Wacker was president of this commission during the eight years of Thompson's first two administrations. In accordance with their plan, ordinances for the improvement of Ogden avenue, Western avenue, Ashland avenue, Robey street and South Water street by special assessment were duly passed by the city council, and ordinances for the issuance of bonds to the amount of $28,000,000 to pay the city's share of the cost of these five improvements were passed by the city council and ratified by a vote of the people.

The Ogden avenue improvement was an extension of the then existing Ogden avenue from Randolph street in a northeasterly direction to the intersection of Clark and Center streets. It ran for about two and one-half miles through a thickly settled, well developed territory and was 108 feet wide throughout the entire distance, intersecting the north and south and east and west streets on diagonal

lines. It took a great many buildings in their entirety, but by reason of the fact that it was a diagonal street it sometimes took only a very small portion of a building and at other times took practically an entire building. Some sections of the territory through which the improvement passed were improved with two-story and three-story brick residences and apartments, some frame residences, also stores, churches, manufacturing, switch-track and railroad property. The area of the assessed district was 9.12 square miles and the number of separate parcels involved in the assessment roll was 33,833.

The Western avenue improvement extended the entire length of the city from the Evanston line on the north to the Blue Island line on the south, or a distance of over twenty-four miles. The street as it then existed was of varying widths. In some places it was 40 feet, at others 50 feet, at others 66 feet, at others 80 feet and at others 100 feet in width. The plan for the improvement contemplated that it should be widened to 100 feet throughout its entire length. The assessed district on Western avenue covered a territory of 8.31 square miles and involved the assessment of 33,533 separate parcels of property. The improvement passed through high-grade residence property, semi-residential, business and manufacturing property, apartment houses, churches, retail stores, theatres, amusement places, industrial and railroad property, switch-tracks, warehouses, etc. Toward either end of the street in the outlying districts it passed through property not so intensively improved and through some sections of unimproved property.

The Ashland avenue improvement contemplated the widening of that street to a width of 100 feet over a distance between eighteen and nineteen miles. The street was of varying widths throughout the different sections as it then existed. It passed through much the same variety of property as did the Western avenue improvement. The area

of the assessed district on Ashland avenue was 9.22 square miles and 58,732 separate parcels were involved in the assessment roll.

The Robey street improvement contemplated the widening of that street to 86 feet throughout a distance of fourteen or fifteen miles. In some sections the street had not been opened at all. In other sections it was 66 feet wide. It passed through much the same kind of territory as did the Western avenue and Ashland avenue improvements, and in certain sections where the street had not been opened its opening would cause it to pass through a heavy manufacturing district. At the time of the trial the roll had been filed upon only one section of Robey street, viz., from Harrison street to Roosevelt road, and this section involved the assessment of 6182 parcels in the assessment roll.

The South Water street improvement was .68 miles long. It involved the construction of a double-deck street along the south bank of the Chicago river westward from Michigan avenue to Washington boulevard. It involved the taking of all the buildings on the south bank of the Chicago river and cutting three or four streets through, south, to Lake street and the elevation of the streets approaching the street from the south to a height of about eight feet at their intersection with the improved South Water street. This elevation was necessary to reach the upper level of the new improvement. The land and buildings to be condemned for the improvement included receiving warehouses, offices and docks of transportation lines, and a great variety of manufacturing and wholesale properties, also a district occupied by a retail fruit and vegetable market. The assessment roll involved the assessment of 11,388 parcels. The settlements and awards made for property taken on South Water street amounted to $16,311,605.

It is evident that property along the entire line of these improvements would have to be acquired by purchase or condemnation and other property damaged, and that in

order to proceed intelligently it was necessary that each piece of property abutting on the improvement should be carefully inspected and appraised by qualified experts, who would be able to confirm their appraisals by facts and figures when called upon to do so in court.

The Chicago Plan Commission on December 20, 1918, adopted by unanimous vote a resolution, a copy of which was on the same day transmitted to the chairman of the finance committee, reciting the need of providing work for returning soldiers and safeguarding the general field of labor during the reconstruction period then upon the country, the great need for the carrying out of the contemplated improvements on the five streets in question, and urging the finance committee to make such appropriation for 1919 as the board of local improvements estimated was needed to cover the work on Ogden avenue in 1919 and to provide for the preliminary work on the other four streets.

On December 30, 1918, the city council by a unanimous vote passed an order authorizing the employment of three real estate and two building experts for work on Ogden avenue. The order was as follows:

"Ordered, that the board of local improvements be and it is hereby authorized to employ as real estate experts in the Ogden avenue widening, Edward C. Waller, Jr., Ernest H. Lyons and Arthur S. Merigold, and to employ as building experts in said work Frank H. Mesce and Austin J. Lynch, rates to be paid real estate experts to be on the basis of one per cent of the value of property and $50 per day for testifying in court on behalf of the city, and building experts to be paid at the rate of one and one-quarter per cent of the value of buildings for detailed, itemized estimates of cost of buildings without plans, and at the rate of two per cent of the value of buildings when plans, diagrams and details are furnished."

In accordance with this order the experts were employed by the board of local improvements, of which Faherty was

president, and they entered upon the discharge of their duties. By the terms of their employment they were required to devote their entire time thereto for five years. As the work progressed they presented their bills for such services as they had rendered, warrants were received therefor and the warrants were cashed by them. There is no question as to the qualification of the experts—no claim that they charged for services not rendered, or that the amounts received by them were in excess of one per cent of the value of the property appraised by them and $50 per day for testifying in court in behalf of the city. No complaint is made as to the character of the services rendered or that they were not highly advantageous to the city. We have held in *Tribune Co.* v. *Thompson, supra,* that such payments were not illegal.

Prior to entering into the contract to give his entire time to the city for five years Lyons had been engaged in the real estate business for many years and derived a very large net income therefrom. As he could not personally conduct this business by reason of his contract with the city and he desired it to be kept intact, so far as possible, until he severed his connections with the city, it became necessary for him to procure some person whom he could trust, to superintend the business and maintain it as a going concern. He and Coffin had been warm friends for many years, enlisting and serving together in the Spanish-American War and being associated in real estate dealings for a period. Coffin was at that time president of the civil service commission of Chicago at a salary of $7500. Lyons offered Coffin ten per cent of the net receipts of his business, which was much better for Coffin from a financial standpoint than the position he then held. Coffin accepted the offer, resigned as president of the civil service commission, and the evidence shows that thereafter he made his headquarters in Lyons' office, in the Stock Exchange building, and spent a portion of each day there, and to the end

of 1922 his receipts from Lyons, as shown by Lyons' books, aggregated about $77,000. Coffin had for years taken a great interest in politics and had held various offices, among them being clerk of the civil service commission, member of the commission and business manager of the board of education. He had further political ambitions. He was a friend of Thompson, affiliated with his organization, and had for years contributed to politics most of his income over his living expenses. During his employment by Lyons he contributed to the organization about one-half of his receipts from Lyons. It is claimed by defendant in error that Coffin's employment was a part of the conspiracy alleged in the bill and was for the purpose of establishing a conduit for Lyons' money between Lyons and the Thompson organization. Coffin testified as a witness for the defendant in error, on cross-examination, that he never was aware of a conspiracy, agreement or understanding among Thompson, Harding, Faherty, Lyons, Waller, Merigold, Koch or Brautigam to the effect that he was to go into Lyons' employ for the purpose of establishing himself as a conduit or means of getting the money out of Lyons in order to be paid to any political organization or for any particular purpose; that he never had any understanding, agreement or conversation with the men mentioned, or any of them, or any other person, in which it was stated, indicated or intimated that he was to go into Lyons' employ for the purpose of acting as a conduit for the purposes stated. Coffin, as a witness for defendant in error, was the only witness on the subject. Others of the experts made large contributions to the Thompson organization. There is no evidence showing or tending to show that Faherty ever received any moneys from any of the experts, either for himself or as a contribution to any political organization.

When the experts received their fees the money belonged to them and they had a legal right to spend it or give it away, as they saw fit. It is a matter of common

knowledge that under our system of selection of officers and candidates for office large sums of money are used in excess of necessary expenses, and there has grown up a most pernicious practice of levying assessments, not legally collectible but which are quasi-voluntarily paid, upon officeholders and appointees by the party or faction to which the officeholders or appointees owe their positions. This practice merits condemnation in the severest terms, but its eradication is a legislative and not a judicial function.

After a careful consideration of the extensive record in this case we are of the opinion that the defendant in error has failed to prove each one of the five points above mentioned, and the decree of the circuit court must be reversed as to Faherty, Coffin and Waller, Jr.

*Decree reversed.*