Frank H. Mesce, Appellee, v. City of Chicago, Appellant.

Gen. No. 40,158.

430

Opinion filed October 25, 1939.

BARNET HODES, Corporation Counsel, JOSEPH F. GROSSMAN, Assistant Corporation Counsel, and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for appellant; JOSEPH FLEMING, WILLIAM WILSON and EMIL F. MEIER, all of Chicago, of counsel.

LITSINGER, HEALY, REID & BYE, of Chicago, for appellee; DANIEL M. HEALY, ELBRIDGE W. RICE and CHESTER E. CLEVELAND, all of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On February 19, 1926, plaintiff filed his declaration in assumpsit against the City of Chicago. The declaration consisted of the common counts and was commenced under the Practice Act of 1907. The court required plaintiff to file a bill of particulars. The latter disclosed that plaintiff's claim was for fees for

alleged services rendered to the city as a building appraiser in the valuating of some 3,400 buildings located on Ashland avenue, Western avenue, Ogden avenue, South Water street, Peterson avenue and Randolph street. He claimed damages in the sum of $854,676.56. His claims for services on Peterson avenue, Randolph street and Ogden avenue were abandoned at the opening of the trial. The services were performed under what is known as the "City Beautiful Plan," which contemplated, among other things, the extension of Ogden avenue and the widening of Western avenue, Ashland avenue and South Water street. The city sought to acquire by condemnation the whole or portions of various parcels of land and of buildings for the purpose of these widenings and extensions. The alleged employment of plaintiff as a building appraiser on Ogden avenue was authorized by an order of the city council of December 30, 1918, which provided compensation "at the rate of 1¼% of the value of buildings for detailed, itemized estimates of cost of buildings without plans, and at the rate of 2% of the value of buildings when plans, diagrams and details are furnished." He claimed employment as a building expert on Ashland avenue, Western avenue and South Water street by virtue of an order of the city council of February 5, 1920, which provided as follows:

"That the Board of Local Improvements be and it is hereby authorized, in accordance with its request of January 8, 1920, to employ the following for such periods of time during 1920 as may be necessary:

"Special Council, 6 at $50.00 per day for each day employed;

"Real Estate Experts, 4 on the basis of 1% of the value of the property and $50.00 per day for testifying in court on behalf of the city;

"Rent Experts, 2 at $50.00 per day for each day employed;

"Building Experts, 3 on the basis of 1% of the value of property and $50.00 per day for testifying in court on behalf of the city; at the rate of 1¼% of the value of building for detailed, itemized estimate of cost of building without plans; and at the rate of 2% of the value of building when plans, diagrams and details are furnished;

"Law Clerks and Stenographers, 2 at $125.00 per month;

"Investigators, 2 at $125.00 per month;

"For mechanical engineering services, $25,000.00;

"For court reporting, $25,000.00;

and to charge the cost of same to such appropriations as may be hereafter made; and the City Comptroller and City Treasurer are hereby authorized and directed to pass payroll for same when properly approved by the President of the Board of Local Improvements;

"Provided, however, that before retaining the services of any special counsel, real estate expert, building expert, rent expert or engineer under this order, the Board of Local Improvements shall secure the approval of the Committee on Finance on the sum and the rate of compensation to be paid, and be it further

"Ordered, That the employment by the Board of Local Improvements of Eugene H. Dupee, Joseph J. Sullivan, William H. Dillon and Rodger Faherty, as special counsel at $50.00 per day; Edward C. Waller, Jr., Ernest H. Lyons and Arthur S. Merigold, Real Estate Experts at $50.00 per day; and Frank H. Mesce and Austin J. Lynch, Building Experts at the rates above set forth, be and the same is hereby approved."

Plaintiff's claim for services as set out in his declaration and bill of particulars, was based on alleged services rendered under the 2 per cent clause of the respective orders, which clause required the furnishing of "plans, diagrams and details." The bill of particulars recited that plaintiff's claim was for services per-

formed for defendant, at its request, and that all plans,
diagrams, details and estimates were delivered to de-
fendant. Defendant filed a plea of the general issue,
supported by an affidavit of meritorious defense.
Later, defendant filed an amended affidavit. After
verdict, the court declined to grant leave to defendant
to file an amendment to the amended affidavit of meri-
torious defense. By the terms of the several affidavits,
among other things, the city denied (1) that the board
of local improvements employed Mesce under the order
of December 30, 1918, or under the order of February 5,
1920; (2) that he furnished the services alleged to have
been furnished; (3) that the city owed him nothing,
and alleged (4) the absence of appropriations by the
city council out of which the plaintiff might be paid.
A trial was had before a jury commencing on Septem-
ber 22, 1937. At the close of plaintiff's evidence and
again at the close of all the evidence, defendant moved
for a directed verdict in its favor. Both motions were
denied. On October 30, 1937, a verdict was returned in
favor of plaintiff in the sum of $144,730.77. Following
the verdict, defendant moved for a judgment *non ob-
stante veredicto,* for a new trial and to arrest the judg-
ment, all of which were overruled. Thereupon judg-
ment was entered on the verdict, to reverse which this
appeal is prosecuted.

In carrying out the "City Beautiful Plan," defend-
ant decided to extend Ogden avenue in a diagonal
direction from Randolph street and Bryan Place to
North Clark and Center streets, and to widen both
Ashland and Western avenues to a width of 100 feet
from the north city limits to the south city limits on
each street. Also, to widen West and East South
Water streets from West Lake street to North Wabash
avenue, and River street from North Wabash avenue
to North Michigan avenue. The latter thoroughfare
is now known as Wacker Drive. To carry out the

projects, it became necessary to acquire, by eminent domain proceedings, the land and the whole or portions of buildings required therefor. Some 3,400 parcels of land with improvements thereon were involved in the four widening and extension projects. In order to defray the costs and expenses to be borne by defendant, a series of bond ordinances were passed by the city council on July 21, 1919, and approved by a vote of the people on November 4, 1919. Among them were the following: Ogden avenue $5,400,000, South Water street $3,800,000, Western avenue $2,400,000 and Ashland avenue $5,800,000, or a total of $17,400,000. Among the expenses to be borne by defendant were those of making valuations for the assessment roll, and negotiations for settlement with property owners, and for use in preparation for and in the trial of subsequent condemnation proceedings. As to other items of expense to be borne by defendant, the bond ordinances provided variously as follows:

(1) Subways
(2) Pavements
(3) Sidewalks
(4) Bridges
(5) Viaducts
(6) Lighting
(7) Engineering Cost
(8) Court Proceedings
(9) Public Benefit

Thus, the item of valuations was but one of ten items. Subways, viaducts and bridges came under the jurisdiction of the department of public works. Widening, paving and condemnation came within the jurisdiction of the board of local improvements. The condemnation ordinances were passed during the years 1919, 1921 and 1922, and provided for the condemnation of property on the four streets, and directed the Corporation Council to file petitions for that purpose. One ordinance covered the whole of Ogden avenue and one the whole of South Water street. The Western avenue improvement was divided into five sections, and the Ashland avenue improvement was divided into nine

sections. A separate condemnation ordinance was passed for each section. A separate condemnation proceeding was commenced and prosecuted under each ordinance, and of course, a separate assessment roll was filed in each case. In most instances only parts of parcels of land and of buildings were taken for widening and extension purposes. That is particularly true of Ashland and Western avenues. Of the total of over 3,200 buildings, on the latter thoroughfares plaintiff considered only 41 as totally destroyed. The Ogden avenue extension, being a diagonal cut, the whole of a building was frequently taken, and in many instances so much was taken as to amount to a total destruction. On South Water street the whole of the building was taken in each case. Out of the taking of the whole or part of buildings and parcels of land, arose the valuation problems. The proceedings were initiated under the Local Improvements Act by filing a petition in each case. That act provides that upon the filing of a petition the court shall enter an order designating two competent persons as commissioners, to act with the superintendent of special assessments, who shall investigate and report to the court the just compensation to be made to the respective owners of the property which shall be taken or damaged for the said improvement, and also what real estate shall be benefited by such improvement, and the amount of such benefits to each parcel. The superintendent of special assessments is *ex officio* secretary of the board of local improvements. In large proceedings such as these, the commissioners have to depend on builders and real estate men to get the value of the land and buildings. The real estate and building experts figure the properties and submit their figures to the commissioners. The commissioners then prepare the roll based on figures thus given them, and file it. It is the commissioners who arrive at the just compensation to be paid for property taken or damaged. The experts simply

furnish figures as to the divers elements which the commissioners use in arriving at their conclusions. Under the order quoted, the board of local improvements was authorized to employ four real estate experts, two rent experts and three building experts. Under the Local Improvements Act, the time of filing the commissioners' report is deemed the application for judgment of condemnation of the property sought to be taken for the improvement, and the value of the property is to be fixed as of the time of the return and filing of such report. As the market value of the property as it stands at the time the petition is filed is not the criterion, any and all changes made after the petition and before the roll is filed, become material. The only figures put in the assessment roll are the compensation for the part taken, the damages to the remainder and the benefits. The value of the building is not shown anywhere in the roll. There is no figure in the roll showing the value of the building exclusive of the land. The cost and the value of the building are, however, elements to be considered by the commissioners in arriving at the market values of the properties. There is no doubt that this was the greatest local improvement ever attempted by the city.

In January, 1920, plaintiff started work on Western avenue. After that, work was started on South Water street and Ashland avenue. He maintains that the work on Western avenue, Ashland avenue and South Water street was completed by the end of 1920. This claim is disputed by defendant, arguing that the bulk of the work as to which plaintiff claims fees herein, was done after 1920. After 1920 the percentage rate of compensation was no longer operative. In proceeding to do the work, plaintiff was furnished with survey plats made by the engineers of the board, and he pursued his appraisal section by section. First, plaintiff and his chief clerk and assistant, Henry J. Apfelbach, an architect, went out on the streets and rode up and

down in an automobile. They would ride a block and get out and walk along the street and look at the plat and look at the buildings and size up the nature of the work. Then they hired draftsmen who went out to make drawings of the buildings that were affected. The plats furnished by the board showed the cutoff line and the buildings that would be affected by the improvement. Apfelbach supervised the draftsmen and instructed them what was required in the way of making drawings. After the draftsmen made the drawings, they brought them to plaintiff's office, where Apfelbach checked and filed them. The drawings for the most part were made on sheets 8½ x 13, furnished by plaintiff to the draftsmen. After the draftsmen drew the plans, Apfelbach checked them against the surveyor's plats. If anything was lacking, the draftsmen would take back the drawing, make the necessary changes and return it. After the drawings were returned, plaintiff and Apfelbach went to the buildings, checked the drawings and made what other notes plaintiff thought would be necessary to make the estimated cost of the buildings. Then the cutting off line was drawn on each plan, from information taken from the surveyor's plats. After the cutting off line was made, plaintiff and Apfelbach went on the street and examined the buildings. They would take the drawing of a building, enter the building and examine it from the inside and the outside and plaintiff would decide the depreciation. In the examination of the buildings, they checked the nature of the foundations, the exterior walls and whether the front was face brick or stone; if it was a frame building, whether it had post, brick or concrete foundations. They checked the depth of the basement, the distance the excavation went below the exterior walls. In frame buildings they checked whether the roof was shingle, clapboard, tar or gravel, and on the inside they checked the nature of the trim, the wood, flooring, plastering, heating and lighting,

the plumbing, whether old-fashioned or modern, how the rooms were painted, whether papered, calcimined or painted, and whether the woodwork was varnished or painted. Then the estimators were assigned to estimate each building. The drawing with notations and field notes was given to the estimators to start figuring the cost of the building. When the estimators finished they put the results on plaintiff's desk, and he went over them. The work was also checked by Apfelbach against the drawings. The work presented by the estimators was in various forms. One man would figure it in a book, another would have loose sheets and pin the sheets to the drawing. Plaintiff went over all these, placed the sundries and miscellaneous and extended the totals with the depreciation. The estimators figured what materials were in the building and estimated the amount. They got the costs from price lists in the possession of plaintiff. When the estimates were completed, the figures were copied in a book. The book was made up by Apfelbach and called, "Itemized Appraisals." The book was made up as the work progressed. The entries were then copied in typewritten form. Plaintiff contends that the book called "Itemized Appraisals" and the sheets taken therefrom and reduced to typewritten form, contained itemized figures as to each building on Western avenue, Ashland avenue and South Water street. In addition, plaintiff claims that detailed reports were made up as to each building on the three streets. Attached to each report was a blueprint of the drawing of the building. About March 1, 1920, some of the work had been completed and plaintiff took over to Michael J. Faherty, president of the board of local improvements, a detailed report and an itemized report of a number of buildings on which his work had been completed. At the same time he presented his bill for work done on the buildings. The bill recited that it covered "preparation of drawings, details, etc. as per detailed list attached. $1,348,125.00 at 2%, $26,962.50." Plaintiff told

Faherty he had brought a bill of the buildings that had been completed and gave him what plaintiff described, an "itemized appraisal and detailed appraisal." Mr. Faherty looked at them and told plaintiff to take back the bill and rewrite it and leave off all of the amounts of the cost of the buildings on the bills. Faherty stated he did not want any values on the bills because they went through various departments in the city hall and anybody could get in and find out what the value was that plaintiff was placing on the building. Faherty added that he had had enough trouble on Ogden avenue and did not want to go through the same trouble on the other improvements. Plaintiff then took the bill back and left the reports with Faherty. He rewrote the bill with the total of all values only at the bottom. Then he presented the bill as revised, to Faherty, and a day or two later brought in a summary of the buildings included in the bill, gave it to Faherty, who returned the reports to plaintiff and told him to keep them in his office, that what he wanted was the summary that gave him the value of the buildings. Thereafter, plaintiff did not deliver the reports to Faherty from time to time, as the appraisals were completed, but kept them in his office until later, when they were delivered to Faherty at his request. Instead of the reports, plaintiff made up and delivered the summaries from time to time as he got the estimates of the values of the buildings completed. Beginning with March 2, 1920, plaintiff presented bills from time to time for completed work. The basis of plaintiff's charge was at the rate of 2 per cent on the reproduction cost of the buildings, as estimated by plaintiff. About the middle of January, 1921, plaintiff presented Faherty with a bill for around $45,000. He then went to the comptroller's office to collect and there saw the bill with Faherty's O. K. on it. The cashier told plaintiff that he had orders from the deputy comptroller not to pay out any more money to the experts. Plaintiff interviewed the deputy comptroller and then the comp-

troller, George Harding. The latter informed him that he, Harding, had been notified by the Chicago Tribune that if he paid out any more money to the experts, he would be held personally liable. Harding told plaintiff that he, therefore, could not pay any more bills. Plaintiff called on Faherty, who stated that he had been notified not to O. K. any more bills on the improvements because of the "order from the Tribune." In April, 1921, the Chicago Tribune filed suit against plaintiff for an injunction to restrain plaintiff from collecting moneys and city officials paying him. No injunction was issued, but there was a prayer therefor. The injunction suit was dismissed after the Supreme Court decisions in *Tribune Co. v. Thompson,* 342 Ill. 503, and *Tribune Co. v. Thompson,* 345 Ill. 439. During the year 1918, plaintiff was paid for services on Ogden avenue, out of the bond funds for that street, the sum of $35,908.02. In the year 1920 he was paid the sum of $47,815.98 on the same street for services which he claimed he completed in 1919. During the year 1920 and in January, 1921, he was paid $266,047.12 on Western avenue, $95,673.04 on South Water street and $50,881.62 on Ashland avenue, making the total payments on all four streets in 1919, 1920 and January, 1921, $496,325.78. In addition, Austin J. Lynch, the other building expert, was paid in the same time the sum of $84,120.21 on Ogden avenue, $349,795 on Western avenue, $95,566.04 on South Water street and $50,347.14 on Ashland avenue. All of the fees paid plaintiff and Lynch were figured on 2 per cent of the reproduction cost of the buildings appraised.

The first point we are called upon to determine is whether plaintiff's services were compensable on the basis of the reproduction cost, or on the basis of the net value. Defendant urges that plaintiff's services were at best compensable on the basis of the net value. Plaintiff insists that he should be compensated on the basis of the reproduction cost. The total cost of labor and material of all trades, including architect's fees,

represented the total reproduction cost. The reproduction cost was the cost of a new building as of the date of the appraisal. To obtain the value of a building, it was necessary to figure the percentage of depreciation of the building, due to age, wear and tear and obsolescence. The reproduction cost, depreciated by the ascertained percentages, resulted in a figure which was the net value of the building. Defendant contends that the computing of the reproduction cost was but a means to an end, that end being the ascertainment of the net value. The rate of depreciation figured by both plaintiff and Lynch averaged about 30 per cent. Plaintiff's charges for services, paid and unpaid, were figured on the reproduction cost and not on the value found by him. His charges were made on the basis of the reproduction cost on the whole and not on the reproduction cost on the part taken. The total reproduction cost on the four streets covered by bills paid to plaintiff in 1919, 1920 and January, 1921, was $24,605,040, whereas the net value was $14,968,090.35. Fees at 2 per cent of the reproduction cost amount to $492,100.82, while at 2 per cent of the net value they amount to $299,361.84. The same degree of difference obtains between the reproduction cost and the net value of buildings covered by the unpaid bills. In the instant case, plaintiff sought to recover at the rate of 2 per cent of the reproduction cost of the buildings on the following streets for services which he alleged he performed in the year 1920: Western avenue, $170,307.02; South Water street, $13,361.90; Ashland avenue, $606,345.18. Thus, the amount of the fees already paid plaintiff, together with the fees which he sought in the instant action, totals $1,286,336.78. The aggregate amount paid to plaintiff and Lynch, plus what plaintiff claims as unpaid, is $1,866,165.17. As stated, the jury's verdict was for the sum of $144,730.77. This is exactly 1 per cent of the reproduction cost of the buildings covered by plaintiff's paid and unpaid bills, less the amount already paid plaintiff in 1919, 1920 and Jan-

uary, 1921. In effect, the jury found that as to the paid bills, all based on 2 per cent of the reproduction cost, he was entitled to 1 per cent of the reproduction cost instead of 2 per cent. The jury likewise awarded him 1 per cent of the reproduction cost on the unpaid bills. The reproduction cost of buildings covered by paid bills totaled $24,605,040. The reproduction cost of building covered by unpaid bills totaled $39,500,705. The grand total of the reproduction cost covered by paid and unpaid bills was $64,105,745. 1 per cent thereof is $641,057.45. The amount already paid by defendant was $496,326.68 and the amount of the jury's verdict was the difference between the paid and unpaid bills, based on 1 per cent of the reproduction cost. It is apparent, therefore, that if the jury had figured at 1 per cent of the net value instead of 1 per cent of the reproduction cost, a verdict in favor of the defendant should have resulted. The jury, in returning a verdict on the basis of 1 per cent of the reproduction cost, necessarily decided that plaintiff was not entitled to recover on the basis of the 1¼ per cent clause, or the 2 per cent clause in the council order. Plaintiff has yielded to this finding and is satisfied to recover on the basis of the 1 per cent clause under which the jury found in his favor. It is apparent that if plaintiff is entitled to but 1 per cent of the net value, then a judgment *non obstante veredicto* must be entered. We shall, therefore, consider the orders under which plaintiff seeks to recover.

At the outset we wish to point out that no city official had the right to modify any of the terms of the two orders. It will be noted that the order of December 30, 1918, does not contain a 1 per cent clause. That order is limited to Ogden avenue and authorizes the employment of ''3 real estate experts on the basis of 1% of the value of the property and $50.00 per day for testifying in court, and 2 building experts at the rate of 1¼% of the value of the buildings for detailed, itemized estimates of cost of buildings without plans, and

at the rate of 2% of the value of the buildings when plans, diagrams and details are furnished.'' The order of February 5, 1920, authorizes the employment of ''real estate experts, 4 on the basis of 1% of the value of the property, and $50.00 per day for testifying in court.'' It also provided for the employment of three building experts ''on the basis of 1% of the value of property and $50.00 per day for testifying in court on behalf of the city; at the rate of 1¼% of the value of building for detailed, itemized estimate of cost of building without plans, and at the rate of 2% of the value of building when plans, diagrams and details are furnished.'' The word ''value'' is used three times in the order of December 30, 1918, once as to real estate experts and twice as to the building experts. In the order of February 5, 1920, the word ''value'' is used four times, once as to real estate experts and three times as to the building experts. Each bond ordinance uses the term ''valuation'' in listing several items, the costs of which were to be borne by the city. Defendant argues that no ambiguity exists in the word ''value,'' and that the order must be held to mean what it says. If we adopt the contention of plaintiff, we must construe the word ''value'' to mean ''cost.'' The word ''value'' has been used seven times in the two orders. The word ''cost'' is also used, which is a strong indication that the city council intended to differentiate between the two words. As defendant points out, if in the case of the real estate experts the word ''value'' is to be construed as ''reproduction cost,'' there is no such thing as the reproduction cost of bare land. Plaintiff, in effect, contends that because he and Lynch billed the city at 2 per cent of the reproduction cost, which bills were approved by the president of the board of local improvements and by the comptroller's office, and paid in due course, that these acts amount to a construction of the two orders by two departments of the city as authorizing payment to plaintiff on the basis of 2 per cent of the reproduction cost. There was no ambiguity

in the orders and an ambiguity could not be created by the acts of the parties. The conduct of the officers of two departments of the city could not establish an ambiguity where none existed. It cannot be seriously contended that the president of the board of local improvements, the comptroller and the plaintiff had power to construe an order of the city council where no ambiguity existed. We are satisfied that the orders, at least in so far as the rate of compensation is concerned, are unambiguous. We are also of the opinion that the proof fails to show that the city officials construed the orders as plaintiff contends. The orders are lacking in definiteness as to the specific service to be rendered. However, the existence of an ambiguity in one word, sentence or clause cannot be ascribed to another word, sentence or clause which has a clear and plain meaning. We are, therefore, of the opinion that defendant was entitled to a judgment *non obstante veredicto*.

Defendant urges that plaintiff did not perform as required by the orders under the 2 per cent or the 1¼ per cent clauses. In view of the verdict of the jury that plaintiff is not entitled to be compensated under the 2 per cent or the 1¼ per cent clauses, and that plaintiff has yielded to the finding, it is unnecessary for us to discuss at length the points raised thereunder. It is sufficient to say that we have carefully considered the respective contentions, and that the verdict of the jury that plaintiff had not performed as to the 2 per cent or the 1¼ per cent clauses, is amply justified.

A further point urged by defendant is that plaintiff, as a matter of law, having failed to prove a substantial performance under the 2 per cent or the 1¼ per cent clauses, a judgment *non obstante veredicto* must follow. The plaintiff seeks to recover under the common counts. The bill of particulars is laid on the special contract under the 2 per cent clause and alleges performance. We agree that there can be no recovery unless it appears that there has been a substantial per-

formance by plaintiff. The evidence clearly establishes that nearly all of the work that plaintiff attempted to perform, was so attempted under the 2 per cent clause. The evidence introduced at the trial was quite voluminous. Without pausing to state the same in detail, it will suffice for us to say that we have given it careful consideration and find that it establishes without contradiction that plaintiff did not prove substantial performance under either the 2 per cent or the 1¼ per cent clauses. The defendant was not called upon to supply merely a valuation on the improvements. Without the other details required under the 1¼ per cent and 2 per cent clauses, the valuations under the 1 per cent clause were worthless to defendant. That is an additional reason why defendant is entitled to a judgment *non obstante veredicto*. Another point made by defendant is that plaintiff, as a matter of law, failed to perform under the 1 per cent clause. The suit is based on a special contract under the 2 per cent clause. Plaintiff did not substantially perform and is entitled to recover, if at all, only on the *quantum meruit*. However, there is no evidence tending to prove the reasonable value of services. Defendant also insists that there was no performance under the 1 per cent clause in any event because plaintiff did not give the date of the valuations of the respective properties. It is conceded that building costs vary widely from time to time. As heretofore pointed out, the date of the filing of the roll in this class of cases is the date as of which the value and damages must be determined. Two rolls were filed in 1921, six rolls were filed in 1922, and one roll in 1923. All of the six rolls filed in 1922 were filed more than two years after plaintiff commenced his work in January, 1920, and two of them more than two and one-half years after the commencement of his work. The roll on the section from 31st to 47th street on Ashland avenue was filed more than three years after he commenced his work. If the unit of cost had been furnished along with the date of the appraisal, the

city might have been able, after the lapse of two or three years, to revise plaintiff's figures on the basis of percentage of increase or decrease in material and labor cost. The absence of dates rendered his valuations worthless.

In passing on the points presented, we have adhered to the rule laid down by our Supreme Court as to the proper procedure to be observed in directing a motion for a judgment *non obstante veredicto.*

In the case of *Libby, McNeill & Libby v. Cook,* 222 Ill. 206, at p. 212, the court stated the rule as follows:

"In either case, if there is no evidence, or but a scintilla of evidence, tending to prove the material averments of the declaration, the jury should be directed to return a verdict for the defendant. If, however, there is in the record any evidence from which, if it stood alone, the jury could, 'without acting unreasonably in the eye of the law,' find that all the material averments of the declaration had been proven, then the cause should be submitted to the jury."

A motion to direct a verdict for the defendant preserves for review only a question of law whether from the evidence in favor of plaintiff, standing alone and when considered to be true, together with the inferences which may legitimately be drawn therefrom, the jury might reasonably have found for the plaintiff. We cannot weigh the evidence. On a motion to direct a verdict, only that evidence can be considered which is in favor of the party against whom the motion is directed. That evidence must be considered in the light most favorable to that party, together with all legitimate inferences which may be drawn from it in his favor.

Because of the views herein expressed, the judgment of the superior court of Cook county is reversed and a judgment *non obstante veredicto* is entered here for defendant and against plaintiff.

*Judgment reversed.*

Denis E. Sullivan, P. J. and Hebel, J., concur.