**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190258-U

Order filed March 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| CHICAGO AUTISM ACADEMY, INC., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| TABRIA ARMSTRONG HILL; MYRA | ) | |
| DUNN; DEVEN SNIEZEWSKI; GUIDING | ) | |
| LIGHT AUTISM ACADEMY INC.; | ) | Appeal No. 3-19-0258 |
| GUIDING LIGHT EDUCATION CENTER | ) | Circuit No. 14-CH-1359 |
| INC.; CHLOE KROLL; WILLIAM PALMER; | ) | |
| and FRANK GLOSKY, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Tabria Armstrong Hill, Guiding Light Autism | ) | |
| Academy, Inc., Guiding Light Education Center, | ) | Honorable |
| Inc., William Palmer, and Frank Glosky, | ) | John C. Anderson, |
| Defendants-Appellees). | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court erred by granting summary judgment in favor of defendants on count III of the fourth amended complaint.

¶ 2        Plaintiff, Chicago Autism Academy, Inc., appeals the Will County circuit court's grant of summary judgment on count III of its fourth amended complaint[1] in favor of defendants, Tabria Armstrong Hill, Guiding Light Autism Academy, Inc., Guiding Light Education Center, Inc., William Palmer, and Frank Glosky.[2] We reverse and remand for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4        In January 2016, plaintiff filed its fourth amended complaint (FAC), verified by Laura Hartwell, president of Chicago Autism Academy (CAA). Only count III of the FAC, alleging "Civil Conspiracy: Breach of Fiduciary Duty," is relevant to this appeal.

¶ 5        According to count III of the FAC, Tabria Armstrong Hill was an at-will employee of the CAA, an Illinois State Board of Education (ISBE) approved private school in Frankfort, Illinois, that serves children with autism spectrum disorder and other developmental disabilities. A majority of the CAA's students are from local public schools that lack the necessary programs for students with developmental disabilities. The local public schools, where the children would have otherwise attended, bear the cost of the CAA's services for those students.

¶ 6        In 2007, Hill began her professional relationship with the CAA as an independent contractor. Hill signed a confidentiality and noncompetition agreement, which provided:

> "During *** her employment and for a period of two *** years after termination of *** her contractual agreement, [Hill] will not in any way be associated with or involved, directly or indirectly, with any person, firm, corporation or other entity engaged in any business which provides services substantially similar to the services provided by the Corporation or its Affiliates within the area known as

---

[1]Plaintiff's fourth amended complaint is captioned "Verified Amended Complaint."
[2]Myra Dunn and Chloe Kroll were dismissed from the cases pursuant to terms of a settlement. Deven Sniezewski was granted summary judgment in a separate motion, which is not part of this appeal.

Chicago and [its] suburbs and Bryan, Ohio and any area located within the vicinity of 50 miles from any other office of the Corporation, whether now operated by the Corporation or hereafter operated by it."

In 2008, the CAA and Hill executed a one-page change of contract agreement. According to count III of the FAC, at the time of the execution of the 2008 change of contract agreement, the parties understood that the change of contract agreement did not terminate the relationship between the CAA and Hill. Rather, Hill's employment status became that of an employee, not an independent contractor, of the CAA.

¶ 7    In 2011, William Palmer and Frank Glosky owned Guiding Light Education Center (GLEC), located in Bolingbrook, Illinois. GLEC was a therapeutic day school. Chloe Kroll worked as an operations manager for GLEC in 2013. Palmer and Glosky desired to expand their services to autism and spectrum-based students because of the higher rate of reimbursement, and eventually created the Guiding Light Autism Academy (GLAA). As part of Palmer and Glosky's exploration of the feasibility of expanding services, Palmer, Glosky, and Kroll toured the CAA in June 2013. The tour was conducted by Hill, without the CAA's permission or knowledge. According to the FAC, Hill then provided the GLAA with the CAA's financial statements, profit and loss information, student lists, program materials, and other general operations information, all without the prior consent of the CAA.

¶ 8    From March 2013 to June 2014, while employed by the CAA, Hill continued to assist Kroll with respect to Palmer and Glosky's plans to begin operating the GLAA, to be located in Bolingbrook, Illinois. The FAC alleged that Hill, during work hours at the CAA, actively solicited the parents of the CAA's students for the GLAA by using the CAA's computers, copiers, and facilities. Hill distributed the GLAA's promotional materials while on the CAA's

3

grounds. The FAC alleged that Palmer, Glosky, and Kroll "encouraged, aided and abetted Hill *** to misappropriate the time, material and property of the CAA, and to breach [her] fiduciary duty to [the] CAA in order to realize an economic advantage for [the GLAA]."

¶ 9        In June 2014, Palmer and Glosky registered the GLAA with the ISBE. The GLAA was originally opened in Bolingbrook, Illinois, 16 miles from the CAA, but was relocated to Woodridge, Illinois, 25 miles from the CAA. Hill resigned from the CAA on June 6, 2014. Her salary with the CAA at that time had been $66,000 annually. Hill began working at the GLAA soon thereafter. At her deposition, Hill testified that her starting salary at the GLAA was $75,000 annually. At the time of her deposition, on May 8, 2018, Hill was making $105,000 annually at the GLAA.

¶ 10        Defendants stated there was no initial plan to hire Hill, even though Hill had made it known to them that she was not happy at the CAA and planned to seek employment elsewhere. Kroll, Palmer, and Glosky did not discuss Hill working for them until May 2014 after they had submitted their application to the ISBE. After that, Palmer and Glosky told Kroll to offer Hill a job. No one promised Hill a job if she gave certain documents from the CAA, helped the GLAA, or brought with her students and staff from the CAA. They were not aware that Hill had any sort of contract with the CAA, such as a noncompete agreement. Palmer specifically asked her that question before she was hired, and Hill stated that she did not.

¶ 11        Defendants denied that the tour of the CAA was without the permission or knowledge of the CAA. Defendants further denied that Hill used the CAA's time and resources to solicit students, or that Palmer and Glosky knew of, encouraged, aided, or abetted such alleged misappropriation. Hill admitted she communicated with Palmer and Glosky but denied that any communication was inappropriate.

4

¶ 12        According to Kroll's deposition testimony, Kroll acted as the operations manager for the GLEC and took on the same role at the GLAA. She "did mostly a little bit of everything from fairs to returning students, meeting with the school district, bookkeeping, forecasting, rate adjustments with the [S]tate, things of that nature." Kroll submitted the GLAA's application to the ISBE and handled the program side of things. According to Kroll, Palmer and Glosky did not have any involvement with the program side of starting the GLAA.

¶ 13        During the GLAA's development, in April 2013, Kroll attended a resource fair at which educators, school districts, and schools were promoting their services and facilities. Kroll "met a lot of great resources," including staff from the CAA, such as Hill. Kroll stated:

> "It was a resource fair so you go to the tables, you get information. I had went to several other tables getting information in regards to all types of students because we had serviced all types of students.
>
> When I met them at their table, they were an autism academy, and I was very interested because I had been doing all of this research. So I went to them and I said, you know, I've been researching trying to get an autism school started. If I need information, would it be okay if I contact you. But I have to let—you know, I'm going to talk to my owners and let them know that I met you and see what we want to do."

Kroll was told that she could contact Hill and other representatives of the CAA. Kroll exchanged business cards with Hill and the other representatives of the CAA. Kroll met with Glosky and Palmer to relay that she had met a resource at the fair who "seemed really friendly and very knowledgeable of the subject, and they said that we can contact them."

5

¶ 14        Kroll set up an appointment for herself, Glosky, and Palmer to tour the CAA with Hill. Kroll thought that Hill was the business manager or school liaison. Glosky, Palmer, and Kroll were interested in a tour of the CAA for the purpose of viewing the equipment, staff, and buildout necessary to support children with autism.

¶ 15        Similarly, Kroll set up a tour of the GLEC for Hill and two other employees of the CAA. Kroll stated the purpose of inviting the CAA employees to the GLEC was "[t]o give [them] any feedback on what [they] were currently doing with [their] students and to show them what [they] were doing to see if we could do autism in a similar facility that [they] were in." Palmer and Glosky did not participate in Kroll's tour with the CAA employees at the GLEC. Palmer and Glosky joined the tour group afterwards for lunch. They spoke about how they were planning on opening the GLAA. Hill stated that she could provide some help. Palmer stated:

> "[T]he help is in general. I mean, when we opened the education center, we got help from various schools, we got help from school districts. This help is—I think it's a broader thing where the people in this business it's all about the kids so the help here is let's make everything better for the kids. If we're opening a new school, everybody should jump in, and we worked on that school, that's how we did the education center, and we're doing the same format for this one."

There was no discussion of Hill joining the GLAA with Kroll, Glosky, and Palmer.

¶ 16        After the tours, Kroll continued to work on the program side of things, including creating manuals, applications, and program materials, and making sure the school met any necessary program guidelines. She also began completing the paperwork to start the GLAA with the ISBE. Kroll stated she sought Hill's assistance in drafting a letter to the school districts and a promotional flier. Hill provided Kroll with the district's contact list to send the flier to, which

6

Kroll said was available to the public online. Kroll relied on Hill's experience to be sure she had prepared the materials correctly. Hill sent another email with the CAA's pay rates from 2011 to 2014, including the average salary of the owner. Neither Kroll, Palmer, nor Glosky asked Hill for this information, nor did they use it.

¶ 17 Deposition testimony made clear that Hill was not being paid by the GLAA prior to her June 2014 employment. The GLAA did not know if Hill had permission from the owner of the CAA to share financial, or any other, information. Moreover, Palmer and Glosky did not ask Hill to solicit students or employees for the GLAA while she worked for the CAA. Palmer and Glosky believed the collegial nature of therapeutic schools explained the reason Hill was so willing to help them.

¶ 18 In response to the FAC, defendants filed a motion for summary judgment. In that motion, defendants noted that the undisputed facts did not contain any evidence supporting the CAA's allegation of a civil conspiracy.

¶ 19 Regarding the civil conspiracy count of the FAC, the circuit court stated:

"In this case, the Court has already concluded that Hill's conduct was potentially tortious. Relative to the issue of conspiracy, the real question is whether the other defendants understood 'the general objectives of the conspiratorial scheme, accept[ed] them, and agree[d], either explicitly or implicitly to do [their] part to further those objectives.' *McClure* [*v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999)]. Candidly, the notion that Hill did not conspire with anyone at [the GLAA] does not pass the smell test. However, that is not the applicable test. If there is evidence in the voluminous record to support a *clear and convincing finding of conspiracy*, [the] CAA has not

7

identified where it is. At most, there appear to be some communications between Hill and [the GLAA] employee *** Kroll. However, [the] CAA does not really discuss Hill's interactions with Kroll (or anyone else) much in its briefs, and therefore it is difficult for the Court to find that *** this rises to the level of *clear and convincing evidence*. This is [the] CAA's 'put up or shut up' moment and it has put up very little. [*Parkway Bank & Trust Co. v.*] *Korzen*, 2013 IL App (1st) 130380, ¶ 14." (Emphasis added.)

The circuit court further stated:

"To the extent there is evidence already existing in the voluminous record that might have been relevant to the Court's ruling but was overlooked, particularly on the issue of conspiracy, the parties may file a motion for reconsideration. The Court offers no advisory opinion on how such a motion would be treated."

¶ 20     The CAA filed a motion to reconsider. At a hearing on the motion to reconsider, the CAA admitted it did not have evidence that Kroll actively or passively sought information from Hill, only that Hill sent the information. The circuit court asked the CAA what the GLAA did to encourage, or otherwise provoke liability from, Hill's behavior. The CAA stated, "[t]here is no smoking gun." The CAA merely indicated the meeting between Hill, Palmer, Glosky, and Kroll was not innocent. The CAA stated, "I think that there has to be some agreement or action between the conspiring parties, and if one person sat passively by, I don't think that that would meet the legal test. I think the question at bar is *** is there enough here to say that that actually occurred, and I think it is." The motion to reconsider was denied. The circuit court granted defendants' Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) motion for an instant appeal.

8

¶ 21                              II. ANALYSIS

¶ 22        On appeal, plaintiff argues that the circuit court erred by granting summary judgment in favor of defendants on the civil conspiracy claim set forth in count III of the FAC.

¶ 23        Civil conspiracy requires proof that a defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64 (1994). Mere knowledge of another party's fraudulent or illegal actions is insufficient to demonstrate a conspiracy. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999). However, " '[a] defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, *either explicitly or implicitly to do its part to further those objectives* *** is liable as a conspirator.' " (Emphasis added.) *Id.* (quoting *Adcock*, 164 Ill. 2d at 64). A civil conspiracy is rarely susceptible to direct proof. *Id.* "Usually, it must be established 'from circumstantial evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.' " *Id.* (quoting *Adcock*, 164 Ill. 2d at 66).

¶ 24        Summary judgment is proper if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018); see also *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 483 (1998). When ruling on a motion for summary judgment, the circuit court considers the pleadings, depositions, and affidavits strictly against the movant and in favor of the nonmovant. *Dowd*, 181 Ill. 2d at 483. Summary judgment is a " 'drastic means of disposing of litigation,' " so it should be granted only if the movant's right " 'is clear and free from doubt.' " *Id.* (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)).

¶ 25        A plaintiff relying solely on circumstantial evidence must demonstrate civil conspiracy by clear and convincing evidence. *Id.* "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Thus, the operative question is whether any trier of fact could reasonably find, by clear and convincing evidence, that a conspiracy existed. See *id.* "Under this clear and convincing standard, 'if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved.' " *McClure*, 188 Ill. 2d at 140-41 (quoting *Tribune Co. v. Thompson*, 342 Ill. 503, 529 (1930)).

¶ 26        The United States Supreme Court has made clear that the application of a heightened standard of proof at the summary judgment stage should not be construed as undermining the function of the jury or authorizing "trial[s] on affidavits." *Anderson*, 477 U.S. at 255. The Court opined:

> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

¶ 27        In the present case, the circuit court concluded that Hill's actions were potentially tortious. *Supra* ¶ 19. There was, however, no direct evidence of an agreement between Hill and the GLAA; as the circuit court put it, there was no smoking gun. Of course, that absence of direct evidence does not foreclose the possibility that the CAA could demonstrate a civil conspiracy. The CAA is instead obligated to take the more common path of demonstrating the existence of

an agreement or common scheme through circumstantial evidence. See *McClure*, 188 Ill. 2d at 134.

¶ 28 The circuit court opined that the notion that Hill had not conspired with the GLAA did "not pass the smell test." We agree. The record establishes that Hill violated her fiduciary duties to the CAA by providing proprietary information to the GLAA, acting as a *de facto* consultant to the GLAA, and seemingly campaigning for the GLAA. The GLAA was thus plainly aware that Hill had a demonstrated history of disregarding her fiduciary duty to an employer. Despite that knowledge, the GLAA hired Hill at an increased rate of pay, followed apparently by significant raises in the following years. This behavior does not comport with "common-sense knowledge of the behavior of persons in similar circumstances." *Adcock*, 164 Ill. 2d at 66.

¶ 29 All justifiable inferences in favor of the nonmoving party must be drawn at the summary judgment stage. *Anderson*, 477 U.S. at 255. The GLAA, while receiving undeniable benefit from Hill's potentially tortious actions against her employer, never demanded that Hill stop delivering information, and never returned any materials back to the CAA. An inference that the GLAA "either explicitly or implicitly" (*Adcock*, 164 Ill. 2d at 64) agreed to do its part to further those objectives—perhaps through the understood offer of future employment—is wholly justifiable. At the very least, the facts tend to cast serious doubt on the GLAA's credibility.

¶ 30 The drawing of legitimate inferences from the evidence and the weighing of witness credibility are functions of the jury, not the court. *Anderson*, 477 U.S. at 255. In this case, a trier of fact drawing justifiable inferences could reasonably conclude by clear and convincing evidence that the GLAA and Hill knowingly and voluntarily engaged in a common scheme. Summary judgment in favor of defendants was inappropriate. We therefore reverse the circuit

11

court's ruling granting summary judgment on count III of the FAC and remand for further proceedings.

¶ 31                              III. CONCLUSION

¶ 32        The judgment of the circuit court of Will County is reversed and remanded for further proceedings.

¶ 33        Reversed and remanded.